Mark **MASTIN**, Petitioner,

v.

Daniel **SENKOWSKI**, Director, Clinton Correctional Facility, Respondent,

and

R. Michael Tantillo, District Attorney of Ontario County, Intervener.

No. 00–CV–6116L(FE).

United States District Court,
W.D. New York.

Nov. 3, 2003.

560

Felix Lapine, Rochester, NY, for Plaintiff.

R. Michael Tantillo, Ontario County District Attorney, Canandaigua, NY, Pro se.

## DECISION AND ORDER

FELDMAN, United States Magistrate Judge.

### PRELIMINARY STATEMENT

Petitioner Mark Mastin ("Mastin"), represented by counsel, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this matter by the undersigned. For the reasons set forth below, Mastin's petition for a writ of habeas corpus is denied.

### FACTUAL BACKGROUND

In the early morning of December 9, 1995, a fatal fire engulfed the home of Mastin and his wife, Lisa Mastin, in the Town of Hopewell in Ontario County. Both Mastin and his wife survived the blaze, but their three young children were trapped inside the burning structure and were killed. Later that day, Mastin gave a statement to police that he woke up to find the house on fire, and that the only area in the house where he noticed flames and smoke was the children's bedroom. This was at odds with the observations of all of the other witnesses to the event, who stated that the flames first appeared in the living room area of the house, and that there was no fire in the children's room until at least twenty minutes later.

Further investigation into the cause of the fire cast Mastin under suspicion, and on December 21, 1995, the police requested that Mastin take a polygraph examination to verify his original statement. The polygraph results allegedly indicated that Mastin was lying about his involvement in the fire. Initially, Mastin maintained his innocence, but after further questioning that afternoon he began to give indications to the police that he was responsible for starting the fire. Mastin ultimately con-

fessed that he had set the fire because he was angry at his wife for having stayed out so late that night and wanted to teach her a lesson. This oral confession was transcribed, and Mastin signed it. He also gave a brief addendum clarifying the first confession, which he also signed.

Mastin was arrested and arraigned later that evening on charges of arson and second degree murder. The Ontario County Grand Jury returned an indictment on January 30, 1996, charging Mastin with first degree arson (New York Penal Law ("P.L.") § 150.20), three counts of felony murder (P.L. § 125.25(3)), and three counts of depraved indifference murder (P.L. § 125.25(4)).

### The Huntley Hearing

Through defense counsel, Mastin subsequently moved to suppress the two statements he made on December 21, 1995, claiming that they were the product of police coercion. A *Huntley*[1] hearing was held in Ontario County Court (Harvey, J.) on June 26 to June 27, 1996. Both Cecil Brand, the police investigator who questioned Mastin, and Lynn Prescott, the polygraphist, testified at the hearing.[2] Mastin did not testify.

Justice Harvey issued a written opinion denying the motion to suppress the statements, holding that the admissions made by Mastin to the police were voluntarily made and admissible at subsequent proceedings. July 10, 1996 Order of County Court ("7/10/96 Order"), Appendix ("App.") 1 at 162. In that opinion, Justice Harvey also denied the motion to dismiss the indictment, finding that the police had the necessary probable cause to arrest Mastin at the conclusion of the statement-making process. *Id.*

### The Trial

Mastin was tried before a jury in Ontario County Court, Justice Harvey presiding, from July 29 to August 8, 1996. A summary of the testimony provided by the various witnesses at trial follows.

### *Elise Knuppenburg*

Elise Knuppenburg ("Knuppenburg") testified first for the prosecution. Knuppenburg lived in the house immediately to the east of the Mastins' house on Routes 5 & 20 with her fiancé, William Hood ("Hood") and her two children. Trial Transcript ("Trial Tr.") at 354; 357. At about 6:20 a.m. on December 9, 1995, Knuppenburg was awakened by pounding on her front door. *Id.* at 358. Knuppenburg came downstairs to find that Lisa Mastin had burst into the house and was standing in her nightgown, "hysterical[ly]" screaming that her house was on fire and that her babies were inside. *Id.* at 358–59. Knuppenburg observed that Lisa's hands were "scratched up," her right leg was burned, and about two or three inches of her hair had been singed. *Id.* at 360; 370. After calling 911, Knuppenburg went outside and "saw flames coming out from the front of the [Mastins'] house" in the location of the "big double glass windows." *Id.* at 362; 389. She did not see flames coming from any other part of the house. *Id.* Notably, Knuppenburg did not see any fire coming from the children's bedroom

---

1. In New York State criminal practice, a *Huntley* hearing is held to determine the voluntary nature of a defendant's statements. *People v. Huntley*, 15 N.Y.2d 72, 78, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965).

2. In the main, Brand and Prescott testified at trial consistently with their *Huntley* testimo-

ny. For the sake of concision, their *Huntley* testimony will not be recounted here. Deviations, if any, in Brand's and Prescott's trial testimony from their *Huntley* testimony will be discussed in the portion of the opinion summarizing the trial.

until about twenty minutes later. *Id.* at 373.

At around that time, Knuppenburg observed Mastin, fully clothed and wearing shoes, walk at a "normal" gait across the front yard and into her house. *Id.* at 367; 373. Knuppenburg asked Mastin what happened, and he replied that his son "Douglas had been playing with matches and caught his bed on fire." *Id.* at 368. When Knuppenburg asked him why he had not taken the matches away from Douglas, Mastin did not reply. *Id.* at 368–69. On cross-examination, Knuppenburg conceded that she did not tell the Grand Jury that she had asked Mastin the latter question. *Id.* at 386.

After that exchange, Mastin stood "very quiet[ly]" at the door and watched his house burn. *Id.* at 369. Mastin did not say anything else, nor did he appear to be crying. *Id.* Meanwhile, Lisa Mastin was still lying on the living room floor "crying and screaming for her babies and saying [the burns on her leg] hurt." *Id.* at 370. Knuppenburg did not see Mastin attempt to console his wife. *Id.* at 374. According to Knuppenburg, Mastin did not appear to be injured, although "one side of his face was red like a bad sunburn." *Id.* at 375. Eventually, Mastin and his wife left Knuppenburg's house in an ambulance. *Id.*

About three or four days later, Mastin and his wife visited Knuppenburg at her home for about an hour; Mastin "was laughing [and] joking." He did not say anything about his children during that conversation. *Id.* at 377.

### *William Hood*

Hood, Knuppenburg's fiancé, testified that he had been a volunteer firefighter for approximately nine years. *Id.* at 395. After being awakened by Knuppenburg with the news of the fire, Hood looked out his bedroom window and saw "flames ... coming out of the big picture window in the north side of [the Mastin's] house." *Id.* at 396–97. As he was donning his coveralls, Knuppenburg told him where the children's bedroom was and where the children had last been seen in the house. *Id.* at 398–99.

When Hood arrived outside the Mastins' house, he noticed that "the fire and smoke was (sic) only coming out of the front of the house[.]" *Id.* at 399; *see also id.* at 402; 404. Hood ran around to the west side of the house, where the children's bedroom was located. *Id.* at 405. There he encountered a man whom he did not know; the two of them proceeded to break the window with "a stick or something." *Id.* After the other man broke the window, a "billow of smoke" came out of the window. Hood waited for a moment until the smoke died down and attempted to climb inside the house, but he "was pushed back because of the extreme heat, intensive smoke" which was "[v]ery black" and "[t]hicker than fog." *Id.* at 405–06. Although Hood could get only one leg in the window, he was able to see that there was no fire in any part of the children's room at that point. *Id.* at 406.

When Hood first saw Mastin that morning, Mastin was standing in Hood's dining room "staring out at the house." *Id.* at 410. Mastin was not crying and displayed no emotion. He appeared to Hood "to be just like a spectator watching a fire." *Id.* When Hood saw Lisa Mastin somewhat later, she was lying on their living room floor with "[s]kin ... hanging off her [legs]." *Id.* at 411. Hood did not observe Mastin make any attempt to speak to or console his wife. *Id.*

Hood testified that he did not see flames coming out of the children's bedroom until he came back outside after calling 911, about twenty minutes after he first saw

the fire in the front picture window. *Id.* at 412.

### Kenneth Favreau

Kenneth Favreau ("Favreau") observed the fire that morning as he was driving to work. *Id.* at 430–31. Favreau, a volunteer firefighter for the previous five and half years, *id.* at 447, testified that as he approached the burning structure, the flames were coming from the northeast side and half of the "picture window" was "already burned out." *Id.* at 439–40. When he first arrived at the house, he did not see any fire on the west side. *Id.* at 449; 450.

Favreau also observed Mastin get into a van and move it to the other side of the driveway. *Id.* at 433. Favreau asked him if there was anybody else in the house and he replied, in a "[p]retty calm" tone of voice "for the events that were ... going on at that time," that there were "three kids" still inside. *Id.* at 435. Favreau asked Mastin where the children were located, and Mastin pointed to the second window down on the west side of the house. *Id.* at 436; 438. Hood had joined Favreau and Mastin by this point, and Hood and Favreau proceeded to the area of the children's bedroom. *Id.* at 439.

Favreau observed that the glass in the children's bedroom window was "partially gone." *Id.* at 441. Favreau put his leg upon the windowsill and, holding onto the roof with his right hand, tried to crawl in the window. *Id.* However, he was unable to gain entry to the children's room because of the "black, billowy, thick, thick smoke." *Id.* According to Favreau, there was still snow on the roof overhang at this point. *Id.* Favreau did not see any flames inside the children's room. *Id.* at 442.

After trying unsuccessfully to gain entry through a window on the southernmost edge of the house, Favreau then went back to the area of the children's room; when

he looked through the window, he observed five to seven spot fires on the floor. *Id.* at 445. That was the first time that he saw any flames in the children's room. *Id.* at 446. Favreau was unable to gain entry to the room on this second occasion due to "the heat and the smoke and the fires." *Id.* At that point, he and Hood returned to the corner near Hood's house to wait until the fire department arrived. *Id.*

Favreau did not see or speak to Mastin again after he first observed Mastin moving his vehicle away from the house. *Id.* at 450. Mastin did not make any efforts to assist Favreau, nor did he make any attempt to enter the house himself. *Id.*

According to Favreau, Hood appeared more upset than Mastin did. *Id.* at 451. On cross-examination, defense counsel elicited from Favreau that he had told the Grand Jury that Mastin " 'started to break down a little bit' " when he told Favreau that his children were inside. *Id.* at 453. Favreau reiterated that Mastin did not break down "to the demeanor (sic) Mr. Hood was.". *Id.* at 454.

### Walter Brown

Walter Brown ("Brown"), a member of the Town of Hopewell fire department and next-door neighbor of the Mastins, was awakened on the morning of December 9th, at about 6:30 a.m. by his beeper. *Id.* at 464–65. Brown immediately dressed in his turnout gear and proceeded to the Mastins' house, where he saw flames coming from the lower window on the ground floor on the "front of the north side of the house," as well as a window above that one on the same side. *Id.* at 465. Brown's first impression upon nearing the house was that he would not be able to enter without his breathing apparatus; nevertheless, he walked around the perimeter of the house to ascertain that in fact there was no place where he could make entry.

*Id.* at 466–67; 476–77. As he circled the house, Brown only observed flames emanating from the northern side of the house, from the front picture window on the first floor (*i.e.*, the living room) and the front second floor window. *Id.* at 467–69; 473–74.

### Jeffrey Dann

Jeffrey Dann ("Dann"), a volunteer firefighter with the Town of Hopewell Fire Department, testified that when he walked outside of his house at about 6 a.m. on December 9th, he noticed a "glow in the sky" to the southeast. *Id.* at 482. As he was leaving for work, the glow appeared to have become bigger, and Dann headed towards it in his car to investigate. *Id.* at 483. By the time Dann arrived at the Mastins' house at about 6:25 a.m., the "residence was pretty well engulfed in flames." *Id.* at 484. Dann observed flames coming from the "northeast part of the house." *Id.* Dann also saw Hood in his front yard, looking around and yelling that there were three children in the building. *Id.* at 486. Mastin, according to Dann, was standing on the Hood's front porch; Dann "didn't really notice him that much other than he was standing there." *Id.* at 487. The fire trucks arrived about five minutes later, as Dann finished walking around the house and determined that there was no way to enter the structure without oxygen. *Id.* at 489–90.

### Patricia Meyer

Patricia Meyer ("Meyer") lived across the street from the Mastins on Routes 5 & 20. *Id.* at 494. At about 6:15 a.m. on December 9th, after looking out her window and seeing that the Mastins' house was on fire, Meyer ran over to see if she could be of any assistance. *Id.* at 496. As she approached the house, she saw that the front of the house, as well as the side visible from her home (the east side), were engulfed in flames. *Id.* at 497. Meyer

saw Hood standing outside; he indicated to her that the children had not been saved. *Id.* at 498. Meyer then went over to the Hoods' house because she heard that the parents of the trapped children were there. *Id.* at 499. Once inside, Meyer saw Lisa Mastin lying on her back on the floor and Mastin squatting down next to her, by her feet. *Id.* at 500. According to Meyer, they were "very calm." *Id.* Mastin "wasn't saying anything ... [h]e was just squatting there." *Id.* at 500–01.

Meyer had come over to the Hoods' house with Officer Daniel Bennett, whom she heard ask Mastin how the fire started. *Id.* at 502. "Without hesitation, [Mastin] looked up and said to him, those kids are always playing with matches or lighter[.]" *Id.* During the fifteen minutes Meyer was at Hood's residence, she never heard Mastin ask about his children. *Id.* at 503. Meyer testified that she heard Lisa Mastin say something about the children to her husband; the trial court sustained defense counsel's objection when the prosecutor asked her about the substance of the comment. *Id.* at 503–04.

### Daniel Bennett

Daniel Bennett ("Officer Bennett"), a deputy sheriff with the Ontario County Sheriff's Department, arrived at the Mastins' house at 6:31 a.m. after receiving the 911 call. *Id.* at 506. He testified that upon his arrival, it appeared that "the whole inside of the house was on fire" as he looked toward the picture window on the front of the house. *Id.* He did not see flames coming from any other portion of the house, however. *Id.* at 507. After speaking briefly about the fire to Hood, who appeared "[v]ery excited," Officer Bennett went over to Hood's residence. *Id.* at 509. In response to Officer Bennett's questions about where he first observed the fire, Mastin replied that "it was coming out of the kids' bedroom, there was

fire and smoke, he tried to enter the room, but couldn't because of the fire, then he ran outside and called up to his wife." *Id.* at 511. During this conversation, Mastin "was very calm" and "never asked about the children at all." *Id.* at 512. As far as Officer Bennett could discern, Mastin did not exhibit any emotion at all. *Id.*

### Deborah Bumpus

When Deborah Bumpus, ("Bumpus"), a volunteer advanced medic with the Canandaigua Ambulance Squad, arrived at the scene, she quickly determined that Lisa Mastin had suffered first and second degree burns on about 16 to 18% of her body. *Id.* at 521. Bumpus had her wrapped in a sterile burn blanket and brought to the waiting ambulance. *Id.* at 521; 527. Bumpus next assessed Mark Mastin's vital signs, which were normal. Bumpus testified that Mastin was "[l]ethargic," showing "no emotion [ ] at all." *Id.* In fact, Bumpus testified that Mastin's lack of affect initially caused her to conclude that he was in shock, but his normal vital signs belied that. *Id.* In Bumpus's opinion, Mastin was "absolutely not" in shock. *Id.* at 525. Mastin did not inquire about his children during the time that Bumpus was in contact with him. *Id.*

When she asked Mastin what the cause of the fire was, he replied that "they were having a terrible time with Louis playing with—with the lighters." *Id.* at 526. When Bumpus pointed out that there is a safety catch on lighters, Mastin said that he and his wife would remove them. *Id.*

Bumpus stayed at the hospital for about five hours, and she was with Mastin when he found out that his children were dead. *Id.* at 530. According to Bumpus, when Mastin heard the news, he "put his head down ... in his hands and cried, I believe." *Id.* Bumpus did not recall if Mastin said anything at that point. *Id.* Prior to that time, Mastin's demeanor had been "[v]ery low-key" with "very little affect." *Id.* at 533.

### Shelley Smith

Shelley Smith ("Smith"), a deputy sheriff with the Ontario County Sheriff's Office ("OCSO"), observed a conversation between Mastin and a registered nurse at the hospital in which Mastin said that "he thought his kids started the fire." *Id.* at 535. Smith later spoke to Mastin individually, and "he said that he was in the living room and there was fire coming from the kids' bedroom and he—he tried to get them out, he was approximately ten steps away and he wasn't able to" because of "the flames that were coming out of the doorway" of the bedroom. *Id.* at 536. Mastin's demeanor "varied greatly from moment to moment" during the four hours that Smith was at the hospital; Mastin alternated from "very casual" to "quiet" to "jok[ing]" with his friend or family." *Id.*

### Donald Barnes

Donald Barnes ("Barnes"), the Fire Coordinator for Ontario County, arrived at the scene at about 6:45 a.m. and saw the structure engulfed in a "huge white cloud of smoke and steam." *Id.* at 557. Barnes characterized the fire as "very hot, very extensive." *Id.* at 558. During the course of investigating the fire scene, Barnes learned that the Mastins' daughter reputedly had last been seen in her bed near the window. *Id.* at 563. After quelling the fire in the children's bedroom, Barnes testified that he was able to reach in through the window and touch the child's body lying on the bed; he did not have to stretch or climb inside the window to do so. *Id.* at 565.

Barnes testified that he and his team did not detect any problems with the LP gas tank, the furnace, or the kitchen range. *See id.* at 572–75. Barnes also ruled out the hot water heater, clothes dryer, refrig-

erator, electrical junction box, and electrical outlets as possible causes of the fire. *See id.* at 577–80; 583.

Barnes testified that the entrance to the children's bedroom on the first floor was "an open doorway coming out into the living area." *Id.* at 582. The stairs to the second floor were "made out of railroad ties or something similar to that." *Id.* at 583. After examining the remains of the house that day, Barnes could find no accidental or natural causes for the fire. *Id.* at 589.

On December 14, 1995, Barnes met with the Mastins at the motel room where they were staying temporarily to discuss the fire. Mastin told Barnes that he had been asleep on the couch in the living room when he was awakened by something; he was not sure what it was. *Id.* at 592. As he awoke, Mastin saw "bright lights flashing" and "his eyes were drawn to the bedroom door area where he saw fire." *Id.* Mastin said that the flames were "[a]round the doorway partition, ceiling level" and were "coming out of the children's bedroom ... [and] going towards the stairway." *Id.* at 593–94. He recalled that the flames traveled from the bedroom, around the south side of the doorway, to the top of the refrigerator where they hit a ceiling beam and stopped. *Id.* at 594.

Mastin told Barnes that he could hear Cassandra screaming and tried to get into the children's room but could not because "it was too hot and there was (sic) smoke and flames." *Id.* at 595. Mastin said that he burned his left hand and the left side of his face at that point; Barnes observed that the burns left scars there. *Id.* at 595; 616. Mastin told Barnes that he "kept hollering for Lisa to come out" and went outside to lie in the snow because he thought that the back of his shirt was on fire. *Id.* at 595–96.

Mastin told Barnes that his son Douglas had picked up his lighter from the coffee table where Mastin kept his cigarettes and started the fire with it. *Id.* at 596–97. According to Mastin, Douglas would have been able to operate the lighter because Mastin broke the safety device off all his new lighters to make them easier to use. *Id.* at 597. Mastin told Barnes that he had put a nail in the casement of the children's window to stop them from climbing out the window to play in the yard. *Id.* at 598.

On cross-examination, Barnes testified that did not smell any gas or other accelerants as he walked around the fire scene, but that he had a "very poor" sense of smell. *Id.* at 607. Barnes also stated that the "accelerant dog" did not detect the presence of hydrocarbons or petroleum based products in the area. *Id.* On redirect examination, Barnes testified that the scent dog is not a "fool proof" way to detect hydrocarbons; it is possible for the accelerants to burn away and leave no residue, or to become flushed away during fire fighting operations. *Id.* at 617. Barnes opined that the fire was "very hot" and that water was applied to the house continuously for 30 to 60 minutes. *Id.* at 617–18. On re-cross examination, Barnes conceded that there was an electronic apparatus available to assist in the detection of hydrocarbons; he chose to use the dog since that did not require him to leave the scene. *Id.* at 620. If the dog had not been readily available, Barnes said he would have retrieved the instrument and performed the test with it. *Id.*

According to Barnes' investigation, there was "[n]ot very much" damage caused to the material underneath the stairs. *Id.* at 609. He agreed that "the point of origin of a fire is very often the point where the most damage is done." It was Barnes' opinion that there was only a "[h]orribly

remote possibility" that the fire could have started underneath the stairs. *Id.*

### Lynn Prescott

Lynn Prescott ("Prescott"), the polygraph operator, was acting in a volunteer role with the OCSO when he interviewed Mastin on December 21, 1995, at the behest of Investigator Cecil Brand ("Brand"). Prescott first met with Mastin at approximately 11 a.m. at the OSCO and began by reviewing Mastin's statement to the police from December 9th and asking him a number of pedigree questions. *Id.* at 626–27. At approximately 1 p.m., Mastin was given a lunch break, and at about 1:30 p.m., Prescott resumed questioning Mastin. *Id.* at 629. Prescott testified that he reviewed the "facts surrounding the fire" with Mastin "quite a few times." *Id.* From about 1:30 to 3:30 p.m., Mastin continued to deny involvement in the fire. *Id.*

Brand took over the questioning at 3:30 p.m. and Prescott exited the room. *Id.* at 629. Prescott did not observe Brand's interrogation of Mastin through the one-way window. *Id.* at 630.

At about 4:45 p.m., Prescott spoke to Mastin again, alone, about how the fire started. *Id.* at 630. Shortly before 5 p.m., Prescott asked Mastin if he started the fire and Mastin replied, " 'I can't come out and say it.' " *Id.* at 632. Mastin then said, " 'I just want to know how I could do this when it goes against everything I believe.' " *Id.* (At trial, Prescott was reading from the verbatim notes he took during the interview.) Mastin described his anger at Lisa for staying out so late as a "nine point five on a scale of ten" and said it was one of the latest times she had been out. *Id.* at 633. When Prescott asked Mastin again, at about 5:15 p.m., Mastin admitted that he started the fire. *Id.* In response to Prescott's question, Mastin said he started it "with a cigarette or a lighter." *Id.* Prescott asked him to specify whether it was a cigarette or a lighter, but Mastin never did. *Id.* at 694; 700.

Mastin told him that he started the fire because "he was angry at his wife and wanted to teach her to stay home with— with him and the—and the kids." *Id.* at 633. Mastin said he had another cigarette after his wife went up to bed but did not say what he did with it. *Id.* at 634. Prescott left the room thereafter to tell Brand about Mastin's statements. *Id.* at 635.

Prescott did not rejoin Mastin until about 7:18 p.m. that evening to attempt to clear up the matter of whether he used a cigarette or a lighter. *Id.* at 697. At that time Mastin told him that "he started the fire with a lighter or a cigarette under the stairs" and "could have possibly used paper" and that "there was some sort of debris under the stairs." *Id.* at 636. This questioning was only for a "very short, brief period" of time. *Id.* at 679. Prescott testified that Mastin did not pin down whether the source of ignition was the cigarette or the lighter. *Id.* at 700. Prescott stated that he asked Mastin "if he knew which it was" and Mastin "said he didn't." *Id.* Prescott said that he had no further involvement in the case after about 7:30 p.m. *Id.* at 679.

On cross-examination, defense counsel made a strategic decision to have Prescott inform the jury that he administered a polygraph examination to Mastin. *See id.* at 641–47. During the polygraph, Mastin denied any responsibility for setting the fire. According to Prescott, Mastin failed the examination. *Id.* at 652. When Prescott rejoined Mastin at about 1:30 p.m. after scoring Mastin's results, Prescott told Mastin that he believed his answers were "very deceptive," *id.* at 675, and the "the charts clearly indicate[d] that [he][was] not telling [Prescott] the truth in this matter." *Id.* at 676. Prescott testified that Mastin made no response to that

statement. *Id.* at 675; 684–85. Prescott did not have a recollection as to how the dialogue proceeded after that. *Id.* at 685. He testified that he "could have" told Mastin he was very deceptive more than once during the interview, but he did not know for certain. *Id.* at 688.

Prescott conceded that Mastin was not given another test in the evening, after he began making inculpatory statements. *Id.* at 652. In response to defense counsel's question as to whether polygraph "machines [are] foolproof and infallible," Prescott demurred, saying that he "would not know." *Id.* at 660. Prescott denied telling Mastin that the polygraph is 95 percent accurate. *Id.* at 701–2.

**3.** The December 9th statement, offered into evidence at trial, read as follows:
"Question, Mark, I want to ask you about the fire that occurred at your home early this morning (12/9/95). Can you tell me in your own words what happened from dinner time last night until you became aware of the fire? Answer, my wife Lisa, me and the kids all ate dinner at about 5:30 or 6 p.m. After dinner, the table was cleared and we all watched T.V., for awhile. At about 7:30 p.m., Lisa started getting ready to go out that night. Lisa left the house at around 8 p.m. After Lisa left, I put the kids in their pajamas and put them to bed. When the kids went to bed, I played video games and watched T.V. on the couch until I fell asleep. I'm not sure what time it was when I fell asleep, but I stayed asleep on the couch until Lisa got home at about 4:30 a.m. When Lisa got home, she woke me up and talked to me briefly while I had a cigarette. While I had been sleeping, Louis had come out of the bedroom and fallen asleep on the living room floor. Lisa picked Louis up and took him upstairs with her so he could sleep in our room. I stayed on the couch and went back to sleep. The next thing I remember is waking up on the couch because of a strange noise. I sat up on the couch and looked toward the kids' room. I saw flames in the doorway of the kids' room shooting in the living room. I got up from the couch and tried to get into the kids' room but couldn't. I could feel a lot of heat on my back as if my shirt was on fire. I ran outside

Prescott testified that neither he nor Brand offered Mastin any promises of leniency or other inducements in return for confessing. *Id.* at 637–38. Mastin never complained to Prescott of anyone threatening or coercing him, and Prescott did not witness any such occurrence. *Id.* at 637. Prescott never heard Mastin tell anyone that he wanted to leave. *Id.* at 639. That day, Mastin appeared "[p]retty laid back [and] calm" to Prescott. *Id.* at 640.

### Cecil Brand

Investigator Cecil Brand ("Brand"), a member of the OCSO, took a statement from Mastin after he was discharged from the hospital on December 9th.[3] *Id.* Brand

and fell to the ground and put out the fire on my back. As I was running out of the house, I called upstairs to Lisa that there was a fire downstairs. When I got outside and was on the ground, I could see Lisa coming out of the upstairs window, which is directly over the doorway to the house. When Lisa reached the ground, I asked her where Louis was, and she said he headed for the stairs. Lisa ran to the neighbors' house and I stepped back into the front door and called out for Louis. At that point, the house was so full of smoke that I was forced back outside. I grabbed a car jack from the front corner of the house and went around to the kids' bedroom window. I broke the kids' window with the jack. When the window broke, the smoke and heat poured out of the house, and I was overcome. I wandered toward the front of the house and noticed our van was still in the driveway near the house. I got to the van and moved it away from the house. As I was moving the van, I remember someone coming up to me and telling them my babies are in there. Then someone (I don't know who) told me that I had to get to the neighbors' house (where Lisa was) because Lisa was hysterical. I went to the neighbors' house and saw Lisa. Lisa and I stayed at the neighbors' house until emergency people began to arrive, and we (me and Lisa) were taken to the hospital. Question, when you woke up on the couch or when you were running through the house, did you see flame or smoke anywhere except for inside the kids' room? Answer, no.

testified that during the course of his subsequent investigation, "other information [was] developed that didn't square with [Mastin's] statement," and Brand decided he needed to speak with Mastin again. *Id.* at 726.

On December 21, 1995, at approximately 10:10 a.m., Brand and another OCSO officer arrived at the Mastins' apartment where they were temporarily staying. Brand asked Mastin if he would be willing to come back to the OCSO to "review and verify his previous written statement." *Id.* at 729. Brand also asked Mrs. Mastin to come to the OCSO to provide a written statement as she had not done so yet. *Id.*

Once at the OSCO, Brand and Mastin went downstairs to the Criminal Investigation Division ("C.I.D.") area where Brand advised Mastin of his *Miranda* warnings. *Id.* at 730. Brand also told Mastin "that he was free to go and that he was not under arrest and that he had come here voluntarily." *Id.* Brand testified that even though Mastin was not in police custody at that time, he read the *Miranda* warnings because he "considered [Mastin] a possible suspect." *Id.* at 731; 777–78. Mastin told Brand that he understood his rights and was willing to speak to him without an attorney present. *Id.* at 731–32. Mastin agreed to verify his December 9th statement through a polygraph examination. *Id.* at 732. From about 11 a.m. until 1 p.m., Mastin was interviewed by Prescott. *Id.* at 733. Brand was not present for this interview, although he could observe Prescott and Mastin through the interrogation

room's one-way window and microphone. *Id.* at 734.

Brand met with Mastin, alone, for the first time at approximately 3:30 p.m. that afternoon. *Id.* at 735. During that interview, Brand asked Mastin if he started the fire; Mastin denied it. *Id.* at 736. When Brand eventually told Mastin that he did not believe him, Mastin was silent. *Id.* Asked by Brand to describe again what happened, Mastin continued with the same response he had given before: "that he had awakened to see the flames in the children's room, that he had tried to get into the children's room and was unable to and then exited the house." *Id.* When Brand asked him how he thought the fire had started, Mastin stated that "it must have been one of the children playing with matches or a lighter in their beds." *Id.* at 737. The conversation continued in this vein for about an hour and fifteen minutes. At about 4:45 p.m., Brand left the room and Prescott entered. *Id.*

Brand observed some portions of Prescott's interview; in particular, he heard Mastin admit that he started the fire with either a cigarette or a lighter because he was angry at his wife. *Id.* at 737–38. When Prescott left the room at about 6 p.m., Brand entered and resumed questioning Mastin. *Id.* at 738. At Brand's request, Mastin gave an oral statement which Brand transcribed by hand. *Id.* When Brand had finished writing, he asked Mastin to read the statement; Mastin stated that it was true and both men signed the statement at the bottom of the page. *Id.* at 738–39.[4] Mastin then agreed

---

Question, what about when you were outside the house? Answer, after I broke the kids' room window and went back towards the front of the house, I remember seeing light coming from the fire through the picture window in the front of the house. Question, do you know how the fire was reported? Answer, as far as I know, someone from the

neighbors' house reported it after Lisa went over there. Question, is there anything that you would like to add to this statement? Answer, not really." *Id.* at 722–5.

4. The People offered into evidence Brand's hand-written notes, which read as follows: "4:30 a.m., Lisa home, up twenty minutes, I had a cigarette while she runs around house,

to give a formal typewritten statement. *Id.* at 742.

Brand and Mastin proceeded to an office where the department secretary was available to transcribe the statement. *Id.* at 743. Brand testified that he "would ask questions, Mark would give responses, secretary would record the questions and answers." *Id.* at 743; 746. Brand told him that as Mastin gave his answers, he might "go over his answers with him" before the secretary recorded them. *Id.* at 743. Brand stated that he did this in order to make the answers "as complete and concise" as possible so as to avoid "a lot of extra questions later." *Id.* at 744. Brand also told Mastin he would do this because he "knew the answers to most of the questions ... because [they] had already gone over them previously." *Id.* at 744–45. Brand instructed Mastin not to let him (Brand) put anything in the statement the he did not want included. *Id.* at 745. Mastin indicated that he understood. *Id.*

When they had finished the statement,[5] Brand asked Mastin if there was anything

---

tuck in kids, shut off lights, lock up. I asked her where she was and what she was doing. She said she went to Sledgehammer's till closing, then to Denny's, then home. Are you coming upstairs; no. She goes up with Louis. I lit another cigarette, can't sleep, angry at Lisa. Finish that cigarette and flicked towards the stairs because I wanted to teach Lisa a lesson, and I hoped it would catch the stairs on fire. After I threw the cigarette there, I rolled over and went to sleep 'cause I was so tired and disgusted.' A little while later, I woke up to the fire." *Id.* at 740–41.

5. The type-written statement offered into evidence by the People read in pertinent part as follows:

"Question, what is your full name? Answer, Mark Brian Mastin.... Question, before we begin, do you fully understand your rights pertaining to this statement? Answer, yes, I do. Question, Mark do you recall giving me a written statement on December 9th, 1995, concerning the fire at your residence at the time (2841A Routes 5 & 20 in the Town of Hopewell)? Answer, yes. Question, was the statement that you gave me on December 9th, 1995, true? Answer, yes. Question, was the statement that you gave me on December 9th, 1995, complete? Answer, no. Question, Mark, could you relate to me in your own words the complete account of what occurred at your residence ... at the time Lisa got home? Answer, Lisa came in about 4:30 a.m. and woke me up. I sat up to have a cigarette while Lisa ran around the house turning off lights, locking the door, tucking in the kids and getting ready for bed. Question, during this time, what if anything, did Lisa say to you? Answer, in the process of her running around, getting ready for bed, she asked me a couple of times if I was coming up to bed and I told her no. Question, why didn't you go upstairs to bed with Lisa? Answer, because I was angry that she had gotten home so late. Question, when Lisa went up to bed, did you see her take Louis with her? Answer, yes. Question, what, if anything, did you do after Lisa and Louis went up to bed? Answer, I stayed up on the couch and lit another cigarette. Question, did you finish the second cigarette? Answer, yes. Question, when you were finished with the second cigarette, did you put it out? Answer, no. Question, what did you do with the second cigarette when you were finished with it? Answer, I flicked it onto the staircase. Question, Mark, why did you throw the lit cigarette onto the staircase? Answer, I was angry at Lisa and wanted to teach her a lesson so I flicked the cigarette onto the stairs and hoped it would catch the stairs on fire. Question, after you threw the lit cigarette onto the staircase, did you stay awake to see what happened? Answer, no. I was so tired and disgusted with Lisa, that I just rolled over and went to sleep on the couch. Question, what's the next thing that you remember after going to sleep on the couch? Answer, waking up to the fire and trying to get everybody out of the house like I said in my other statement. Question, in your first statement, you said that you tried to get into the children's bedroom but couldn't because of the fire and you said when you went outside, you called up to Lisa. Did you ever see Lisa on the stairs with Louis? Answer, yes, after I couldn't get into my kids' room from inside, I headed toward the front door of the house. When I turned away from my kids' room, I saw Lisa on the stairs with Louis. I told her to get out of the house and

he wished to add, and Mastin replied affirmatively. *Id.* at 746–47; *see* note 5, *supra.* When the addendum was completed, Brand asked Mastin to read the first few lines of the body of the statement to verify that he could read English. *Id.* at 748. Brand then had Mastin read the entire statement to himself and asked him to sign it if he had no corrections or changes. *Id.* at 749. Mastin signed the statement, and Brand signed it as a witness. *Id.* This process lasted from about 6:30 p.m. until 7:00 p.m. *Id.*

Brand testified that he found it necessary to speak to Mastin again that evening because he felt that this first written statement was not accurate; Brand doubted that a lit cigarette landing on a stair could have ignited the stairs. *Id.* At that point, however, Brand did not know what the staircase looked like at the Mastin's house. *Id.* Brand had a conversation with Mastin at about 7:20 p.m. in which Mastin explained that the staircase was comprised of flat pieces of wood on a riser frame with space in between each stair. *Id.* at 754. Mastin told Brand that when he had flicked the cigarette at the staircase, it had gone through the staircase and fallen to the storage area below. *Id.* at 755. Mastin stated that he was willing to put that in writing, and they returned to the secretary's computer to have the second statement typed in the same fashion as the first. *Id.* Mastin read through and signed it once it was completed. *Id.* at 756.

On cross-examination, defense counsel questioned Brand as to why he did not tell Mastin prior to his arrival at the OSCO that a polygraph operator was going to examine him. *Id.* at 776. Brand stated

that he "felt it would be unnecessary pressure on him at the time," but denied that it was because he was afraid that the Mastins would call a lawyer. *Id.*

Brand denied telling Mastin that "polygraphs don't lie," although Brand did state that he believed the polygraph and that he thought Mastin was being untruthful. *Id.* at 785–87. Brand also accused Mastin directly of starting the fire. *Id.* at 787. However, he denied providing Mastin with "scenarios" of how the fire might have been started. *Id.* at 787; 789; 814; 825. Brand conceded that during the *Huntley* hearing, he responded affirmatively when asked by defense counsel whether he told Mastin how he thought Mastin set the fire. *Id.* at 814. At trial, Brand stated that his *Huntley* testimony was "an error." *Id.* at 815. Although Brand admitted raising his voice at Mastin during their late afternoon interview, he stated that he was just "acting angry." *Id.*

Brand testified that he did not have Mastin sign a verification that he received his *Miranda* warnings because he considered the interview on December 21st an "informal" investigation. The OCSO rules only require a written verification in the case of a "formal" investigation. *Id.* at 790.

On cross-examination, Brand conceded that he did not actually ask Mastin if the cigarette in fact fell through the stairs; he testified that he was "satisfied" with Mastin's answer that the cigarette "would have fallen" through the stairs. *Id.* at 811. Brand agreed with defense counsel that "[s]ometimes [he] provide[d] the question and the answer" during the statement-taking process. *Id.* at 812. Brand at-

then I went out the front door. Question, Mark, is this the starting point of the previous statement that you gave on December 9th, 1995? Answer, yes. Question, is there anything that you would like to ad to this state-

ment or to the previous statement? Answer, this was not intended to be the way it happened. Even though I wanted the stairs to catch fire, I never meant to hurt my children or my wife." *Id.* at 750–53.

tempted to clarify this statement on redirect, however. As an example, Brand explained that he asked Mastin to relate in his own words the complete account of what occurred from the time his wife got home. *Id.* at 829. When Mastin first answered, he had left out what time Lisa arrived home, so Brand said to Mastin, "Lisa gets home at what time?" Brand testified that Mastin said "4:30." *Id.* According to Brand, "the answer that was actually taken down is—is 'Lisa came in about 4:30 a.m.'" Brand testified that the foregoing exchange was "typical of the process." *Id.*

Brand denied threatening or coercing Mastin. He testified that he never promised Mastin any leniency or deals as inducement for confessing. *Id.* at 758–59. Brand testified that Mastin never asked to leave or that the questioning cease. *Id.* at 759. Brand testified that at no time did Mastin ask to speak to a lawyer, but he did ask Brand at one point if Brand thought he should have an attorney. *Id.* at 759–60. Brand told Mastin that he could not answer that question, but because he had mentioned an attorney, Brand stopped the interview and re-advised Mastin of his *Miranda* rights. *Id.* Mastin agreed to continue the interview without an attorney present. *Id.*

Brand denied telling Mastin that he was "going to question [him] as long as it takes," and he testified that Mastin did not appear scared or tired to him. *Id.* at 819; 820. Mastin did not display any emotion or remorse to Brand on that day, or on December 9th. *Id.* at 761. Brand described Mastin's demeanor throughout the day on December 21st as "[q]uiet, submissive," *id.* at 819, and "[v]ery calm and quiet," *id.* at 761.

### Janet Payne–Hall

Janet Payne–Hall ("Payne–Hall") was the secretary called in by Brand to make a typewritten transcription of Mastin's statement on the evening of December 21st. *Id.* at 846–47. Payne–Hall explained that the answers she typed were not "verbatim, word for word answers from Mark Mastin." *Id.* at 851. Rather, sometime Mastin and Brand "would discuss the—the series of events before the—the question—an (sic) answer was (sic) typed, so they would discuss what the answer was relative to that question." *Id.* Payne–Hall stated that she never typed anything that was not what Mastin said to Brand, and that there were no "thoughts" in the statement that had not been expressed by Mastin. *Id.* At the end of the statement, which was begun at 6:29 p.m., Brand asked Mastin if there was anything else he wanted to add. *Id.* at 852. Payne–Hall typed Mastin's answer verbatim on the computer. *Id.* Contrary to Brand's testimony, Payne–Hall did not recall Mastin reading the statement out loud before he signed it. *Id.* at 861.

### John Lewis

John Lewis ("Lewis"), an inmate serving time at the Ontario County Jail, shared the same cell block with Mastin. *Id.* at 866; 876. On direct examination, Lewis testified to a fairly extensive criminal record, including attempted criminal possession of a weapon, forgery and grand larceny, driving while impaired by drugs and by alcohol, aggravated harassment, and criminal contempt. *Id.* at 866–74; *see also id.* at 900–12.

Lewis testified that he conversed with Mastin in the cell block on a regular basis. *Id.* About three weeks prior to trial, Mastin appeared "very upset" after learning that his statements were going to be admitted in court. *Id.* at 878. According to Lewis, Mastin "was ... ranting on about the neighbor, who was the fireman, claiming that he went over and broke two windows trying to save the children, and Mark said he had already broken one of the

windows[.]" *Id.;* 919–20. Mastin told Lewis that the fire "had got going . . . and he saw Lisa and Louis on the stairs and turned around and walked out to move the van." *Id.* at 878–79.

Lewis asked Mastin if he "really thr[e]w a cigarette," and Mastin stated that he "took some of the oil from the [kerosene] lamp [near the stairs], put it on the rug . . . [a]t the bottom of the stairs." *Id.* at 879. Mastin said that he lit it with his lighter and stood there and watched it burn. *Id.*

Mastin also told Lewis that he had argued heatedly with his wife about how late she had come home that night. During the argument, which woke Louis up, Mastin called her and the children "white trash" and said that he "wasn't even sure if the kids were his." *Id.* at 880. When Lisa asked him if he was coming upstairs, Mastin replied, "no way in hell." *Id.*

Lewis testified that he was not receiving any leniency [6] in return for his testimony, and that he understood that the sentence of one and one-half to three years he was going to receive for his pending weapons possession charge was mandatory and could not be reduced. *Id.* at 882. Lewis said that he came forward with his testimony because he could not "live with the thought of what happened to those children." *Id.* Lewis denied that he made an extra effort to get Mastin to talk to him after he found out that Mastin had an upcoming trial date. *Id.* at 920.

### Allen Emerson

Allen Emerson ("Emerson"), a private investigator specializing in fire investigations, testified that he was retained by the Ontario County District Attorney to provide an opinion as to the cause and origin of the December 9th fire. *Id.* at 935. In the course of his investigation, Emerson found that the "vast majority" of the damage appeared to be on the northeast corner of the structure. *Id.* at 939. Emerson opined that the structural damage in the living room/kitchen area was "intensely worse" than in the children's bedroom. *Id.* at 949.

Emerson testified that the fire entered the children's room "from above, from the adjacent second story portion . . . and rolled through the top of that, like an attic or space area, and also through the open doorway and into this section of the house, completely from that direction." *Id.* at 952. Emerson testified that if the fire had originated the children's room, the rafters "would have been consumed relatively quickly for the simple reason the bunk bed has a tendency to transfer the fire to the ceiling level." *Id.* at 954. However, Emerson's investigation revealed that the bottom side of the rafters facing toward the living room area were in relatively good condition. *Id.*

After examining the base of the staircase, Emerson characterized the level of damage there as "[e]xceedingly bad" and not consistent with normal fire behavior; the heat at floor level is typically much less than at ceiling level. *Id.* at 969. Emerson observed that the entire area was "charred deeply with total destruction occurring." *Id.* That indicated to Emerson that "unusual burning" occurred at floor level. *Id.* at 970; 972. Emerson elaborated, stating that the "deep charring and alligatoring [*i.e.*, roughness] and consumption of the first tread of the stairway" was "very" significant because it should have been a protected area. *Id.* at 973; *see also id.* at 975; 976; 977. The extreme dam-

---

6. Respondent notes that despite Mastin's suggestions to the contrary in his habeas brief, Lewis in fact received the promised sentence of one and one-half to three years in prison. Respondent's Habeas Brief ("Resp't Habeas Br.") at 28.

age Emerson observed to the bottom stair tread indicated a longer period of burn at floor level and an "unusual and unnatural" burn pattern behavior in that area. *Id.* at 977–78.

After reviewing all of the evidence from the fire scene, Emerson concluded that the fire "positively did not start underneath the stairs." *Id.* at 983. Moreover, Emerson opined that the fire did not start by means of a cigarette being thrown through the stairs into the debris underneath the stairs. *Id.* After Emerson discovered a stain on the brick floor at the base of the stairway, he determined that the char pattern in that area indicated an "accelerant and wood flow pattern." *Id.* at 985–86. Normally, one would not expect to see any combustion of brick flooring. *Id.* at 986.

Emerson testified that, based on his examination of the fire scene along with the information received from various witnesses (*e.g.,* Lisa Mastin's alleged escape route and Elise Knuppenburg's observations), it appeared that the fire spread "rather rapidly" throughout the bottom part of the living room/kitchen area of the house. *Id.* at 991. Emerson's investigation revealed no natural or accidental cause of the fire. *Id.* at 992.

He determined that the point of origin was "at the foot or very near the foot of the stairs, and possibly throughout part of the living room floor." *Id.* at 993. It was Emerson's opinion that the fire "[a]bsolutely [did] not" originate in the children's bedroom, given the presence of unburned material in that room, the "obvious" path of the fire and burn pattern, and the evidence of charring in the living room and adjacent area. *Id.* at 994; *see also id.* at 1007. Emerson opined that an accelerant was used to set the fire, in light of the degree of heat at floor level, the depth of charring, the total overall destruction of the structure at floor level, and the rapidity with which the fire appeared to spread throughout the first story. *Id.* Emerson testified that a "small rug saturated with oil" could have sustained the heat long enough to start the stair timber on fire.[7] *Id.* at 1011.

### Edward Mastin

Edward Mastin ("Mastin, Sr."), the defendant's father, testified that his son telephoned him from jail at some time during July of 1995. *Id.* at 1030. When asked whether the subject of oil lamps arose during that conversation, Mastin, Sr. replied affirmatively. *Id.* However, the trial court sustained the prosecutor's hearsay objection. *Id.* at 1030–31. When Mastin, Sr. again mentioned that the July conversation was "when [his] son talked about the oil lamps," the court had this answer stricken from the record. *Id.*

### James Dano

James Dano ("Dano"), a former high school classmate of Lisa Mastin, testified that they had an extramarital affair in the autumn of 1995. Dano spent the night with Lisa at her house on several occasions while Mastin was on the road due to his truck-driving job. Dano testified that he observed at least one oil lamp standing on the television set in the Mastin's living room and that there "could have" been more. *Id.* at 1054.

---

7. Mastin testified that he bought an oil lamp for his wife every Christmas; the lamps stood on various pieces of furniture in the living room. *Id.* at 1163–64. Mastin stated that the oil lamps were not lit on the night of December 9th. *Id.* at 1164. He also admitted that "[a]s far as [he] [could] recall," there was a throw rug near the bottom of the stairs. *Id.* On cross-examination, Mastin testified that there was oil in all of the lamps at the time of the fire. *Id.* at 1167.

## Mark Mastin

The defendant described a "troubled" marriage with his wife Lisa, which included two or three separations. *Id.* at 1061–62; 1171–76. He testified during the separations, he "usually" had custody of the children. *Id.* at 1062. Mastin admitted that during the beginning of his wife's first pregnancy, he was not sure that Louis was his child. *Id.* at 1170. Mastin testified that, at his wife's request, they had previously entered into an "open marriage" when he took an out-of-state truck-driving job; Mastin claimed at the time of the fire Lisa told him that she had stopped seeing other men. *Id.* at 1178. Mastin knew that Dano was spending nights at his house while he was away; he testified that he believed it was purely platonic and that Dano was there to help Lisa with the children. Mastin lost his truck-driving job in the fall of 1995, and the family was subsisting on welfare. *Id.* at 1183. Mastin conceded that the life he and his family were living was "depressing." *Id.* at 1188.

December 8, 1995 was a Friday. That evening, after Mastin cooked dinner for the family, Lisa Mastin left for one of her "usual Friday night outings" at a local bar. *Id.* at 1072. On cross-examination, Mastin admitted that he called her a "slut" because of the way she was dressed, but claimed that it "was not said angrily[;][i]t was just a statement." *Id.* at 1202.

After putting the children to bed, he watched television and played video games until he fell asleep on the couch. *Id.* at 1080. Lisa woke him up when she got home at 4:30 a.m. Asked on direct examination if he was "disgusted" at the lateness of her return, Mastin replied "a little bit," but said that he was not angry. *Id.* at 1073; *see also id.* at 1081–83; 1188–89. Lisa got ready for bed, went into the children's room to say good-night, picked up Louis, who had fallen asleep on the living room floor, and brought him upstairs. *Id.* at 1083. Lisa asked Mastin if he was coming up to bed, but he declined because he was "dead beat tired" and it was too much of an effort. *Id.* at 1084; 1206. Lisa made him put out the cigarette he was smoking, and then she went upstairs. *Id.* at 1085.

Mastin testified on direct examination that he then rolled over on the couch and fell asleep; he later awoke to a "glow and a sound." *Id.* He looked over towards the children's room and saw "flames near their doorway" and flames "on the top bunk." *Id.* at 1086; 1088; *see also id.* at 1210–11; 1212; 1221. Mastin did not see his son Douglas in that bed.[8] *Id.* at 1212–16; 1246–47. Mastin stated that he did not see fire anywhere else besides near the bedroom doorway and the bunkbed. *Id.* at 1087.

On cross-examination, Mastin testified that at first, he thought that the glow "at the top of the stairs," was from the Christmas tree lights, even though the Christmas tree was behind him. *Id.* at 1210. Mastin stated that the glow was actually from flames in the living room, not from the children's room. *Id.*

Mastin said he did not see a fire at the bottom of the stairs because when he looked towards the children's room, he was "looking high, not low." *Id.* at 1087. Mastin testified that he did not know if there were flames at the lower portion of the living room, even though when he woke up, he was lying down on the couch about a foot and a half off the floor. *Id.* at 1221. Mastin testified that "he tried to go straight in their room" but "got blocked by heat, flame, smoke." *Id.* at 1087; *see also*

---

8. The Mastins' daughter slept in the bed near the window; the two boys shared the bunkbed, Douglas on the top and Louis on the bottom. *Id.* at 1203.

*id.* at 1088; 1217–18. Mastin testified that he did not see any flames on the staircase when he woke up. *Id.* at 1222–23. Upon seeing Lisa wrapped in a blanket at the top of the stairs, Mastin yelled for her to get out of the house. *Id.* at 1089. Mastin testified that he did not notice flames on the stairs until sometime in between his first and second attempt to enter the children's room. *Id.* at 1223. He conceded on cross-examination that he did not know what prevented Lisa from coming down the stairs at that point, even though there was no fire on the stairs. *Id.* at 1223–24.

As he backed into the children's room on his third and last attempt, he felt "a lot of heat" on his back which caused him to run outside to try to extinguish the flames in the snow. *Id.* at 1090; 1219. However, Mastin's shirt was never actually on fire. *Id.* at 1220. Mastin stayed outside and waited for his wife to hand Louis down to him; instead, Lisa jumped out of the window. *Id.* at 1090. Mastin, upon hearing that she had last seen Louis near the staircase, went back in the front door to try to find him. *Id.* at 1091. Mastin testified that he "couldn't even get halfway across the—the living room" because "it was so full of smoke and heat." *Id.*

With a car jack retrieved from a bucket near the garage, Mastin "pushed in" the window to the children's bedroom and "[b]roke in the glass." *Id.* at 1092. However, Mastin was "forced back from the window" by "thick black smoke." *Id.* Mastin testified that he saw no flames in the room at that point, only "black." *Id.* Mastin said that the "smoke was rolling out so thick" that he was unable to insert any part of his body into the window over his daughter's bed. *Id.* at 1234. Mastin conceded on cross-examination that five or ten minutes later he saw Hood or Favreau "leaning over [in the window] where they found [his] daughter's body[.]" *Id.* at 1242.

Mastin then walked to the front of the house and decided to move their van "before the fire crews got there." *Id.* at 1093. As Mastin was getting out of the van, a man (Kenneth Favreau) approached him and asked if anyone was in the house; "panic[ked] and hysterical," Mastin "yelled to him, my babies are in that house." *Id.* After Mastin brought Favreau to the children's bedroom window, "somebody" told him that he was needed at the Knuppenburg's "to help calm [his wife] down." *Id.* at 1095; 1239–40. At one point, Mastin attempted to leave the house, but "[s]omebody stood in front of [the] door so [he] couldn't get out of there" and told him it would "be better" if he stayed out of the way. *Id.* at 1097–98.

That day, Mastin told several people that he thought his son Douglas "might have gotten a hold of [his] lighter and started the fire." *Id.* at 1099–1100; 1104–6. At that time, he was thinking back to a couch fire that occurred around Thanksgiving which, "as far as [he] knew, Douglas had set." *Id.* at 1100–1. Mastin conceded that when Knuppenburg asked him how the fire had started, he did not say that he did not know. *Id.* at 1292. Mastin explained his lack of emotion during the fire as due to his being "worn out emotionally" after "trying to get [his] kids out all morning long" and his having "already been through a state of panic[.]" *Id.* at 1102.

About an hour after Mastin learned of his children's deaths, Brand approached him about making a statement. *Id.* at 1104. Mastin testified that he told Brand that he "thought Douglas might have been playing with [his] lighter again, just like [he] told everybody else." *Id.* Once at the OCSO, Mastin spoke with Brand and his partner for about five hours. *Id.* at 1107. Mastin testified that Brand read him his

*Miranda* rights that day; Brand told him it was "just routine." *Id.* at 1107–8. As a result of this interview Mastin gave a statement which Brand typed on the computer.

On December 21, 1995, Mastin testified that he was asked by Brand and his partner to accompany them to the OCSO for the purpose of verifying his December 9th statement. *Id.* at 1111. Mastin again was read his *Miranda* rights by Brand who informed him it was "just routine." *Id.* at 1114. After he verified his statement, Brand asked him if he wanted to take a polygraph test, and Mastin said yes. *Id.* at 1115. Mastin underwent the examination from about 11 a.m. until 1 p.m., at which time he was given a lunch break.

When Mastin met with Prescott again at about 1:30 p.m., Prescott allegedly told him that the "machine [was] 95 percent accurate" and that he "knows when somebody is lying, this machine doesn't lie … he's there to help [him], [he] could erase a mistake." *Id.* at 1120–21. Prescott then asked him how the fire started, and Mastin replied that he did not know. *Id.* at 1121.

Mastin testified that Brand came in and out of the room while he was speaking with Prescott, and appeared to be "getting angrier every time[.]" *Id.* at 1122. Brand told him that he "was sure [Mastin] started the fire, he was sure [Mastin] was lying, the machine said it and he knew it." *Id.* Mastin said Brand "yell[ed]" and "scream[ed]" at him and threatened to "throw [him] up against the wall" if Mastin did not look at him. *Id.* 1122–23.

At around 3:30 p.m., Brand took over the questioning and told Mastin that in his opinion, Mastin "set [the fire] to kill that f* * *ing bitch" and that Mastin "didn't care if [he] hurt those f* * *ing children in the process." *Id.* at 1124. Brand told Mastin that "he was getting more pissed off every time he saw [him], every time

[he] denied starting the fire." *Id.* at 1124–25. Mastin said that he was "not a violent person" so this was "very scary" to him. *Id.* at 1125.

When Prescott resumed the interrogation at about 4:45 p.m., he told Mastin that he wanted him to say the words, "I started the fire." *Id.* Prescott told Mastin that he would not be able to "help him" any more with regard to Brand if Mastin did not say those words. *Id.* at 1125–26. Mastin testified that he informed Prescott that he "[could] not come out and say that because [he] didn't do it." *Id.* at 1126. He told Prescott, "[h]ow can I come out and say something like that when it goes everything (sic) that I believe in myself." *Id.*

About 5:15 p.m., Mastin testified that he repeated the words, "I started the fire" to make sure that Prescott would not leave him alone with Brand. After saying it, he told Prescott that he did not feel better and it was "the worse (sic) lie [he] ever told in [his] life." *Id.* at 1127. Brand eventually re-entered the room and began telling Mastin the ways that he thought Mastin had started the fire—with "a lighter on [his] kid's blanket that he was sleeping under," a "lighter under the staircase or in the northeast corner of the house," and the "cigarette flicking scenarios." *Id.* at 1128.

Mastin testified that even though he denied each version, Brand began writing down exactly what he (Brand) was saying. *Id.* Mastin claims that Brand was the one who selected the staircase scenario; he merely told Brand that if he were to "do something that stupid" he would have flicked the cigarette toward the stairs. *Id.* at 1274. When Brand was finished, he showed Mastin the statement and asked him to sign it. *Id.* at 1129–30. Mastin claimed that he did not bother to read it, since Brand was reading it aloud as he was

writing. *Id.* at 1137. Mastin testified that he signed it, "[b]ecause [he] didn't want [Brand] to change it back to [him] using the lighter some place in the house later on, making it—make it sound like some terrible person[.]" *Id.* at 1131; 1272.

When Brand asked him to provide a written statement, Mastin agreed, thinking that he had no choice at this point. *Id.* at 1132. Brand read him the questions that were on the secretary's computer screen and Mastin answered them. *Id.* at 1138. Throughout the process, Mastin claimed that Brand looked "mad, angry." *Id.* at 1141. Mastin testified that the first type-written statement was essentially Brand's version of events, and that Brand had the secretary type things that flatly contradicted what Mastin actually said. *See id.* at 1141 *et seq.; see also id.* at 1267–71; 1278. For instance, Mastin said that he did not go up to bed with Lisa because he was "too tired," but Brand instructed the secretary to type that Mastin was "angry" at his wife. *Id.* at 1142. Mastin testified that he complained to Brand about this. *Id.* at 1144. Even though he testified earlier on direct examination that he was a little disgusted at Lisa's late return, he stated that he did not use the word "disgusted" at any time when talking to Brand, and that Brand chose to put that in the statement. *Id.* at 1144–45.

Mastin testified that Brand made up the last question and answer in the statement, telling Mastin "it would make [him] sound like a better person[.]" *Id.* at 1146. Mastin testified that Brand promised him he would not be charged "if [he] went along with what [Brand] was doing." *Id.* at 1147–48. According to Mastin, Brand told him that "nobody would ever hear what was said in that station house." *Id.* at 1282.

Brand had Mastin read a few lines of the statement out loud; then he spread the pages out so that just the signature lines were visible and had Mastin sign them. *Id.* at 1148. Mastin spoke again with Prescott and Brand after he signed the statement; he claimed that they wanted him to say that he used a lighter underneath the stairs to start the fire and asked him to describe what that area looked like. *Id.* at 1150. Mastin testified that he never told anyone that he started the fire by flicking a lit cigarette underneath the stairs. *Id.*

Subsequently, at around 9:00 p.m., Mastin claims that he gave a second statement expounding upon how a lit cigarette tossed at the stairs could have started the fire because he "was tired of it, [he] was scared and [he] just wanted to get out of this situation." *Id.* at 1151. Mastin testified that he asked to leave several times that day, but they told him that they "weren't through yet." *Id.* at 1151–52. On cross-examination, however, Mastin conceded that he never said at any time on December 21st that he refused to talk to Brand any further. *Id.* at 1288. Mastin testified that he also asked for a lawyer sometime after he received the polygraph results, but Brand told him he "would have to be charged in order to have an attorney." *Id.* at 1153–54; 1290.

Later that evening, Brand presented Mastin with the written charges against him; Mastin testified that he was "dumbfounded," stating that he "thought all day long they were looking to put an arson charge on [him][;]" he "never thought of—of murder." *Id.* at 1155–57.

### The Verdict

The jury returned a verdict convicting Mastin of first degree arson, three counts of felony murder, and three counts of second degree manslaughter as a lesser included offence of the three counts of depraved indifference murder. Mastin was

sentenced on October 22, 1996 to terms of imprisonment of 25 years to life on each of the arson and felony murder convictions and 5 to 15 years on the manslaughter convictions. All sentences were set to run concurrently.

### Procedural History

Through counsel,[9] Mastin appealed his conviction to the Appellate Division, Fourth Department on October 12, 1999, raising nine grounds for reversal. Defense counsel also attacked Mastin's conviction collaterally through a motion filed pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10(1)(b) and (c) on January 17, 1997, alleging that "newly discovered evidence" established that the District Attorney knowingly had allowed prosecution witness Lewis to perjure himself at trial. Justice Harvey denied the motion without opinion on July 7, 1997. *See* App. 2 at 9–10. The Appellate Division granted leave to appeal on September 26, 1997. *Id.* at 8.

The Fourth Department considered Mastin's direct appeal and denial of his C.P.L. § 440.10 motion simultaneously. The court found that although the trial court had committed two errors, they were harmless in light of the overwhelming evidence of Mastin's guilt and unanimously affirmed his conviction in a decision entered May 7, 1999. *People v. Mastin*, 261 A.D.2d 892, 690 N.Y.S.2d 801 (4th Dept. 1999). The Court of Appeals denied leave to appeal on August 17, 1999. *People v. Mastin*, 93 N.Y.2d 1022, 697 N.Y.S.2d 581, 719 N.E.2d 942 (1999).

In the present federal habeas petition, Mastin urges the same grounds for overturning his conviction as he did in the state courts: (1) newly discovered evidence proved that a prosecution witness gave testimony which the People knew or

should have known was false; (2) the trial court erred when it did not allow defense counsel to question Mastin's father regarding their alleged July 1996 telephone conversation regarding oil lamps; (3) the trial court erroneously refused to permit defense counsel to cross-examine Lewis about a pending criminal charge; (4) Mastin's statements to the police were involuntarily made; (5) the trial court erred in precluding the testimony of a witness from the Department of Social Services who would have testified as to Lisa Mastin's allegedly abusive behavior toward her children; (6) the prosecutor allegedly allowed the Grand Jury to know that Mastin failed a polygraph examination; (7) the trial court erred in declining to issue an adverse inference charge regarding the failure to record the December 21st interrogation; (8) the trial court improperly refused to grant the defense's request for a missing witness charge based on the People's failure to call Lisa Mastin; (9) the delay in Mastin's arrest and arraignment constituted a denial of his constitutional rights; and (10) the prosecutor engaged in misconduct warranting reversal by cross-examining Mastin in violation of the court's earlier *Sandoval* ruling.

### DISCUSSION

### The Review Standard

Because the petition, which was filed on November 5, 1999, postdates the enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), AEDPA's revisions of 28 U.S.C. § 2254 govern this proceeding. *See Williams v. Taylor*, 529 U.S. 362, 402, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). When Congress enacted AEDPA, it significantly curtailed the role of federal habeas courts in reviewing petitions filed by state prisoners. *Id.*

---

**9.** Mastin's trial counsel has represented him at all stages of this criminal proceeding.

A federal court may not grant a habeas petition on a claim that was adjudicated on the merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) and (2).

A state court decision is "contrary to" established federal law if the state court either "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams*, 529 U.S. at 405–06, 120 S.Ct. 1495. A state court decision is an "unreasonable application" of Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular case." *Id.* at 407–08, 120 S.Ct. 1495. The Supreme Court made clear that "an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* In order to justify habeas relief under § 2254, the state court's application of clearly established federal law must be "objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495. In sum, a federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal question differently. *Aparicio v. Artuz*, 269 F.3d 78, 94 (2d Cir.2001). The state court's application of the federal law "must reflect some increment of incorrectness such that it may be said to be unreasonable." *Id.* (citing *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000)).

"A state court determination of a factual issue is, moreover, presumed to be correct." *Overton v. Newton*, 295 F.3d 270,

275 (2d Cir.2002). The state court's determination "is unreasonable only where the petitioner meets the burden of 'rebutting the presumption of correctness by clear and convincing evidence.'" *Id.* (quoting 28 U.S.C. § 2254(e)(1)).

Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies. For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits" and (2) reduces its disposition to judgment. *Sellan v. Kuhlman*, 261 F.3d 303, 309 (2d Cir.2001).

### Exhaustion

██ Before seeking a writ of habeas corpus in federal court, Mastin must have exhausted all available state remedies either on direct appeal or through a collateral attack of his conviction. 28 U.S.C. § 2254(b); *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir.1994), *cert. denied*, 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995). The exhaustion of state remedies requirement means that Mastin must have presented his constitutional claim to the highest state court from which a decision can be obtained. *See Morgan v. Bennett*, 204 F.3d 360, 369 (2d Cir.2000) (citing *Grey v. Hoke*, 933 F.2d 117, 119 (2d Cir. 1991)). To properly exhaust a claim, Mastin must have fairly apprised the state court of the claim's federal nature and of the factual and legal premises underlying the claim. *Grey*, 933 F.2d at 119–20.

██ Respondent does not raise the failure to exhaust with regard to any of Mastin's claims. This Court believes, however, that there is an exhaustion issue concerning Claims Five, Six, Eight, Nine

and Ten,[10] although the remaining five claims have been properly exhausted.[11]

Defense counsel raised the identical factual and legal arguments which form the bases of all ten claims in his brief to the Appellate Division, but he did not raise Claims Five, Six, Eight, Nine and Ten specifically when seeking leave to appeal to the New York Court of Appeals. In counsel's May 25, 1999 letter to the Court of Appeals, he states that "enclosed are the appendix and brief that were submitted by the appellant[.]" Petitioner's Leave Letter ("Pet'r Leave Ltr."), attached as Exhibit ("Ex.") A to Petitioner's Habeas Brief ("Pet'r Habeas Br.") at 94. Counsel then argues at length the merits of Mastin's claims of newly discovered evidence (Claim One) and the trial court's evidentiary errors involving the preclusion of testimony regarding oil lamps (Claim Two) and cross-examination of a prosecution witness (Claim Three).

After stating that "[t]here are a number of other questions of law raised in this appeal which ought to be reviewed," counsel explains that "[h]igh on the list of errors ... are [those] arising out of the court's refusal to suppress the confessions" made by Mastin. Counsel continues, stating that "[f]inally, the issue of failure to audiotape or videotape the interrogation process" warrants review. Thus, defense counsel specifically raised the failure to issue an adverse inference charge regarding the police's failure to record the interrogation (Claim Seven) and the involuntariness of his confession (Claim Four), thereby exhausting them.

Counsel closes the letter by stating: "For the above stated reasons, the appellant urges that leave to appeal be granted. Appellant specifically requests that every issue of law presented by the record in this case be considered in conjunction with this application." *Id.* at 97. However, counsel does not give even a passing mention to

10. The Court refers to the claims in the habeas petition consistently with the order in which they are listed on pages 45–46, *supra,* which is the same order in which they are set forth in Mastin's brief.

11. Respondent argues that Claims Two, Three, Eight and Nine are procedurally defaulted because Mastin failed to preserve them for review at the trial court level. Resp't Habeas Br. at 4. With regard to Claims Two and Three, the Appellate Division considered the merits of both claims and did not indicate that defendant failed to preserved them for review. *See People v. Mastin,* 261 A.D.2d at 894, 690 N.Y.S.2d 801. Where, as here, the " 'state courts themselves have disregarded the default and decided the constitutional claim on the merits,' " the Second Circuit recognizes that the principle barring habeas review of procedurally defaulted claims is " 'relaxed.' " *Reyes v. Keane,* 118 F.3d 136, 138 (2d Cir.1997) (quoting *Roman v. Abrams,* 822 F.2d 214, 222 (2d Cir.1987)). Consequently, even if defense counsel did not properly preserve Claims Two and Three, the

state court's consideration of the claims on the merits allows the habeas court to review them. *See Reyes,* 118 F.3d at 138. As to Claim Eight, defense counsel requested a missing witness charge and excepted to the court's refusal to so charge, *see* Trial Tr. at 1313–14, thereby properly preserving this claim for habeas review. Finally, the Court disagrees with respondent that Mastin waived Claim Nine by not registering an objection to the delayed arraignment at trial or at the suppression hearing. New York's "contemporaneous objection" rule, C.P.L. § 470.05(2), provides that "a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented [for purposes of appeal] when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction[.]" Since Claim Nine arises out of the alleged delay in Mastin's arrest and arraignment, it is not the type of trial error governed by C.P.L. § 470.05(2). As there is no preservation issue as to Claim Nine, the Court finds that it is not procedurally defaulted.

any of the other five claims raised on direct appeal.

The Second Circuit addressed the particular exhaustion requirements of the leave to appeal letter in *Grey v. Hoke*, 933 F.2d 117 (2d Cir.1991). There, the petitioner identified one claim in his leave-to-appeal letter and also attached his Appellate Division briefs, which raised three issues including the one specified in the letter. 933 F.2d at 120. The Second Circuit held that only the one claim which was expressly raised was properly exhausted, noting that "[t]he only possible indication that the other two claims were being pressed was the inclusion of a lengthy brief originally submitted to another court. This did not fairly apprise the court of the two claims." *Id.* The Second Circuit declined to impose upon the New York Court of Appeals "a duty to look for a needle in a paper haystack." *Id.* (citations omitted). The Second Circuit revisited *Grey* in *Jordan v. Lefevre*, 206 F.3d 196, 198 (2d Cir. 2000). As in *Grey*, the petitioner in *Jordan* argued one of his claims in the application for leave to appeal, and "asked that he be given permission to appeal 'for all these reasons and the reasons set forth in his Appellate Division briefs.'" *Id.* The court held that "arguing a single claim at length and making only passing reference to possible other claims to be found in the attached briefs does not fairly apprise the state courts of those remaining claims." *Id.*

By contrast, the petitioner in *Morgan v. Bennett*, 204 F.3d 360 (2d Cir.2000), did not identify or discuss any particular claim, but rather requested that the Court of Appeals "consider and review all issues in [petitioner's] brief and *pro se* supplemental brief." *Id.* at 369–70. The Second Circuit held that this statement was "sufficiently specific to alert the Court of Appeals that [petitioner] sought review of all

of the issues raised in his *pro se* supplemental Appellate Division brief." *Id.* at 370–71. In distinguishing *Morgan*, the Second Circuit made clear that in *Jordan* it was the explicit request to review all issues in the Appellate Division briefs that made the difference: "Had [petitioner] more clearly stated that he was pressing all of the claims raised in the attached brief, or had his letter made no argument in detail but rather only 'request[ed that the Court of Appeals] consider and review all issues outlined in [his] brief,' the result here would be different and the remaining claims would have been fairly presented to the Court of Appeals." *Jordan*, 206 F.3d at 199 (citing *Morgan*, 204 F.3d at 370–71).

Mastin's case is distinguishable from *Morgan*. Unlike counsel in *Morgan*, Mastin's counsel did not request that the Court of Appeals "consider and review all issues outlined in [petitioner's] brief." *Morgan v. Bennett*, 204 F.3d at 369–70. Rather, the present factual circumstances align Mastin's case more closely with *Grey* and *Jordan*: counsel's mere enclosure of his Appellate Division brief in his leave to appeal application, while clearly singling out five claims, is not sufficient to constitute exhaustion of the remaining five claims. *See also, e.g., Ramirez v. Attorney General of New York*, 280 F.3d 87, 97 (2d Cir.2001) ("References to attached briefs without more will preserve issues only if the Court of Appeals is clearly informed that the reference is asserting issues in those briefs as bases for granting leave to appeal.").

Clearly, the words in defense counsel's letter, "[f]or the above stated reasons," refer to counsel's foregoing detailed discussion of Claims One, Two, Three, Four and Seven. Fairly read, that phrase cannot be construed as incorporating other, different claims asserted in the lower court as grounds for leave to appeal. *See Ramirez*, 280 F.3d at 97; *see also Tirado v.*

*Walsh,* 168 F.Supp.2d 162, 168 (S.D.N.Y. 2001) (petitioner's mere enclosure with his letter application of the briefs filed in the Appellate Division did not exhaust claim regarding witness's alleged incredibility because petitioner did not specifically request the court to review the remaining issues contained in his brief; rather, petitioner directed the court's attention solely to a single issue concerning the trial court's reopening of the suppression hearing). Thus, beyond stating that the appellate briefs are "enclosed," defense counsel does no more to alert the court that he intends to raise other arguments in those briefs as bases for leave to appeal. This is insufficient under the decisional law in this Circuit concerning the exhaustion requirement.

Finally, I find counsel's blanket statement that "[a]ppellant specifically requests that every issue of law presented by the record in this case be considered" to be inadequate to alert the Court of Appeals to the Claims Five, Six, Eight, Nine and Ten. These claims are therefore unexhausted.

■ However, it is clear that Mastin can no longer exhaust these claims in state court. First of all, he is procedurally barred from raising the unexhausted claims before the New York Court of Appeals because he has already made the one request for leave to appeal to which he is entitled. New York Court Rules § 500.10(a). Secondly, collateral review of these claims is unavailable because they were previously determined on the merits on direct appeal. C.P.L. §§ 440.10(2)(a); 440.10(2)(c) (barring review if claim could have been raised on direct review). These procedurally defaulted claims thus are "deemed exhausted." *See Grey,* 933 F.2d at 120–21.

Federal habeas review of this procedurally defaulted claim is only possible if Mastin "can show cause for the default and prejudice attributable thereto," or demonstrate that failure to consider the federal claim will result in a "fundamental miscarriage of justice." *Murray v. Carrier,* 477 U.S. 478, 485, 495, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (internal quotations omitted) (citation omitted); *accord Velasquez v. Leonardo,* 898 F.2d 7, 9 (2d Cir. 1990). Mastin can meet neither prong of this test, and he has not made a colorable showing of actual innocence so as to warrant invocation of the "miscarriage of justice" exception. *See McCleskey v. Zant,* 499 U.S. 467, 495, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). Consequently, he cannot overcome the state procedural bar.

In the interest of completeness and judicial economy, however, I will consider the claims as they easily may be disposed of on the merits.

### Unexhausted but Procedurally Defaulted Claims

### Claim Five: Improper Exclusion of Department of Social Services Records

Mastin asserts that his due process rights were violated by the trial court's refusal to allow him to call as a witness a case worker employed by the Ontario County Department of Social Services ("OCDSS") who was charged with evaluating the Mastin family. Based on defense counsel's offer of proof, the trial court ruled that the case worker's testimony and the OCDSS case file on the Mastins were not relevant to the issues in the case.

On direct appeal, the Fourth Department agreed that the trial court "did not err in excluding evidence concerning defendant's wife's mistreatment of the children," because "[s]uch evidence was collateral and conjectural and would have diverted the jury from the question of defendant's guilt or innocence." *People v. Mastin,* 261 A.D.2d at 894, 690 N.Y.S.2d 801.

■ It is well established that the due process right of a defendant at trial includes the right to a "fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). In particular, "[t]he rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." *Id.; accord Rosario v. Kuhlman*, 839 F.2d 918, 924 (2d Cir.1988) (the right to call witnesses in order to present a meaningful defense at a criminal trial "derives from general fairness requirements of the due process clause of the fourteenth amendment ... and ... from the compulsory process clause of the Sixth Amendment").

■■ The right to present a defense is not absolute, however, and the accused in a criminal case "must comply with established rules of procedure and evidence designed to assure both fairness and reliability." *Chambers*, 410 U.S. at 302, 93 S.Ct. 1038. On habeas review of an allegedly erroneous state court evidentiary ruling, the court must differentiate between mere errors of state law and those of a constitutional dimension. *See Jones v. Stinson*, 229 F.3d 112, 120 (2d Cir.2000) (relief under 28 U.S.C. § 2254 is unavailable for mere errors of state law). In order for an evidentiary ruling to rise to the level of constitutional error, "the excluded testimony [must be] material to the presentation of the defense so as to deprive the defendant of fundamental fairness." *Rosario*, 839 F.2d at 924. Evidence is material if its inclusion would have " 'create[d] a reasonable doubt that did not otherwise ex-

ist.' " *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 112–13, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). Thus, the ultimate question is whether the introduction of the case worker's testimony and the OCDSS file would have created reasonable doubt as to Mastin's guilt.

■ In his offer of proof at trial, defense counsel stated that the OCDSS worker would testify that Mastin was a caring and dependable parent, while Lisa Mastin was "volatile" and "unreliable." Defense counsel claimed that the OCDSS records documented numerous instances of neglect and threats of violence by Mastin's wife. According to defense counsel, this evidence proved that it was more likely that she, rather than Mastin, started the fatal fire. *See* Pet'r Habeas Br. at 53; 58 ("It was ... relevant evidence that showed that the petitioner, going by past conduct, was incapable of starting the fire.").

As respondent points out, most of the information contained in the OCDSS records was hearsay in the form of statements from a variety of sources, including caseworkers, teachers, and anonymous callers. Much of the information was either pure opinion, remote in time from the fire, or both. In addition, respondent asserts that the records also contain reports of incidents which portray Mastin in an equally negative light and purport to document instances of his abusive behavior. *See* Respondent's Habeas Brief at 47–48 (citing App. 1 at 200–201).[12]

At trial, Mastin's guilt was established through his confession that he started the fire, as well as circumstantial evidence con-

---

**12.** In its habeas brief, respondent avers that "the same [OCDSS] records cited by the defense would also show the following," and proceeds to lists nine abusive or neglectful acts allegedly committed by Mastin towards his children over a period of time from April 1993 up until the time of the fire. Resp't Habeas Br. at 47–48. Respondent also discussed these alleged incidents in its opposition to Mastin's September 27, 1996, C.P.L. § 330.30 motion to set aside the verdict. *See* Tantillo Affirmation, App. 1 at 200–01. Tellingly, Mastin has never attempted to refute these assertions.

cerning his conduct on the morning of the fire. There were also substantial discrepancies between Mastin's version of events and that of every other witness who testified at trial. The introduction of the OCDSS records would not have assisted the jury in its task of determining Mastin's guilt beyond a reasonable doubt, but rather would have turned the trial into a contest between the defense and the prosecution as to who was the better parent— Mastin or his wife. Thus, the state court's finding that it was not error to exclude the evidence regarding Lisa Mastin's alleged mistreatment of her children was not unreasonable. Accordingly, Mastin's claim that he was deprived of his constitutional right to present a defense fails on the merits. *See Rosario*, 839 F.2d at 924.

### Claim Six: Grand Jury Testimony Regarding the Polygraph Examination

Mastin asserts in his habeas petition that during the district attorney's presentment of his case to the Grand Jury, he "allowed the Grand Jury to know that petitioner had failed a polygraph examination." Addendum 2 to Habeas Petition ("Pet'n") at 4. This mischaracterizes what the district attorney actually stated to the Grand Jury:

> Now, let me just point out right now. Polygraph tests are absolutely not admissible as evidence in New York State in criminal proceedings. And the only reason I brought that up with Mr. Prescott was to ask for the period of time that he was with [Mastin], but you are to infer nothing from the fact the polygraph was administered to Mr. Mastin and the results of that test are not going to come before you. It was only mentioned just to ask (sic) [13] for a period of several hours of contact.

Resp't Habeas Br. at 53 (citing Grand Jury Tr. at 195, App.1 at 123).

Mastin's claim based on the prosecutor's alleged impropriety in allowing the Grand Jury to know that he submitted to a polygraph examination does not present a constitutional claim that is cognizable on federal habeas review. *See, e.g., Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir.1989) (claims of error in a grand jury proceeding, including insufficiency of evidence to indict and the prosecutor's failure to present exculpatory evidence, are not cognizable in a habeas corpus proceeding); *Cadilla v. Johnson*, 119 F.Supp.2d 366, 371–72 (S.D.N.Y. 2000) (petitioner's claim that improper hearsay testimony was admitted during grand jury proceeding was not a constitutional claim subject to federal court review); *Boyd v. Hawk*, 965 F.Supp. 443, 451 (S.D.N.Y.1997).

■ Mastin's guilty verdict transforms any defect in the state Grand Jury proceeding into harmless error, because the trial conviction establishes not only probable cause to indict, but also proof of guilt beyond a reasonable doubt. *See United States v. Mechanik*, 475 U.S. 66, 70, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986) (footnote omitted); *accord Lopez v. Riley*, 865 F.2d at 32 ("If federal grand jury rights are not cognizable on direct appeal where rendered harmless by a *petit* jury, similar claims concerning a state grand jury proceeding are *a fortiori* foreclosed in a collateral attack brought in federal court."). The prosecutor's alleged impropriety in allowing the Grand Jury to know that Mastin submitted to a polygraph examination was cured in the trial before the *petit* jury, which convicted him. *See Lopez*, 865 F.2d at 33. Thus, in light of *Mechanik*, error before the grand jury, if any, was harm-

**13.** Respondent has indicated that this should read "account." Resp't Habeas Br. at 53.

less. *Id.* (citing *Mechanik,* 475 U.S. at 70, 106 S.Ct. 938).

■ Moreover, Mastin's claim that improper testimony concerning the administration of the polygraph test was submitted to the Grand Jury is without merit under state law. In New York, any prejudice resulting from reference to a polygraph examination is cured with appropriate instructions from the trial judge. *People v. Jackson,* 198 A.D.2d 436, 436, 604 N.Y.S.2d 144 (2d Dept.1993) (court's prompt curative instruction to disregard the statement that defendant had taken a polygraph, not to speculate about it or the results, and not to draw any inferences or conclusions from the statement eliminated any prejudice to the defendant); *People v. Chavez,* 275 A.D.2d 888, 889, 713 N.Y.S.2d 386 (4th Dept.), *lv. denied* 95 N.Y.2d 962, 722 N.Y.S.2d 479, 745 N.E.2d 399 (2000); *see also, People v. Hopkins,* 86 A.D.2d 937, 940, 448 N.Y.S.2d 574 (3d Dept.1982) (the results of a polygraph test were erroneously admitted at trial, but curative instructions rendered the error of disclosure of such results harmless). As noted above, the prosecutor issued a curative instruction, informing the Grand Jury that it was "to infer nothing from the fact the polygraph was administered to Mr. Mastin." Resp't Habeas Br. at 53 (citing Grand Jury Tr. at 195, App.1 at 123).

### Claim Eight: Missing Witness Charge

A habeas petitioner challenging a state conviction based on a claim of improper jury instructions "faces a substantial burden." *DelValle v. Armstrong,* 306 F.3d 1197, 1200 (2d Cir.2002); *see also Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977) ("The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack ... is even greater than the showing required to es-

tablish plain error on direct appeal."). Before a reviewing court may overturn a conviction based on a challenge to a jury instruction, petitioner must establish "not merely that the instruction [was] undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to [him] by the Fourteenth Amendment." *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). Because Mastin here disputes the trial court's refusal to give a requested charge, his burden is that much heavier. *See Henderson,* 431 U.S. at 155, 97 S.Ct. 1730 ("[a]n omission, or incomplete instruction, is less likely to be prejudicial than a misstatement of the law").

■ " 'The decision whether to give a missing witness charge is committed to the sound discretion of the trial court.' " *Jones v. Spitzer,* 2003 WL 1563780, at *39 (S.D.N.Y. Mar. 26, 2003) (quoting *Manning v. Walker,* 2001 WL 25637, *9 (E.D.N.Y. Jan. 3, 2001) & citing *Reid v. Senkowski,* 961 F.2d 374, 377 (2d Cir.1992) (citation omitted)). A state court's failure to issue such a charge rarely will support a reversal or habeas relief because review courts recognize the " 'aura of gamesmanship' that frequently accompanies requests for a missing witness charge as to which the trial judge will have a surer sense than any reviewing court." *Malik v. Kelly,* 1999 WL 390604, at *7 (E.D.N.Y. Apr. 6, 1999) (quoting *United States v. Torres,* 845 F.2d 1165, 1171 (2d Cir.1988) (quotation omitted)). Cases are "legion" that have declined habeas relief to petitioner based on a purported failure to provide a missing witness charge. *Jones,* 2003 WL 1563780, at *39 (citing, *inter alia, Reid,* 961 F.2d at 377; *Correa v. Duncan,* 172 F.Supp.2d 378, 381–82 (E.D.N.Y.2001); *Johnson v. Greiner,* 2001 WL 876811, at *8–9 (S.D.N.Y. Aug. 2, 2001), *aff'd,* 56 Fed.

Appx. 38, 2003 WL 358702 (2d Cir.2003); *Manning*, 2001 WL 25637, at *9–10).

New York law requires the party seeking a missing witness charge to demonstrate that "the uncalled witness is knowledgeable about a material issue upon which the evidence is already in the case; that the witness would naturally be expected to provide noncumulative testimony favorable to the party who has not called him, and that the witness is available to such party." *People v. Gonzalez*, 68 N.Y.2d 424, 427, 509 N.Y.S.2d 796, 502 N.E.2d 583 (1986) (citations omitted); *accord People v. Kitching*, 78 N.Y.2d 532, 536, 577 N.Y.S.2d 231, 583 N.E.2d 944 (1991).

Defense counsel argued that Lisa Mastin was under the People's exclusive control, as evidenced by the fact that she had instituted divorce proceedings against her husband and that the prosecution had her under subpoena. Trial Tr. at 1313. In his petition, Mastin also argues that his wife's hostility is demonstrated by her having provided the prosecution with various letters written by Mastin which the district attorney used to cross-examine him. Pet'r Habeas Br. at 84–85 (citing Trial Tr. at 1264). However, Justice Harvey found that "the control of Mrs. Mastin is not established in the People on this record." Trial Tr. at 1314. Because this is a factual determination, it is presumed to be correct unless rebutted by clear and convincing evidence, and Mastin has not fulfilled this burden. *See* 28 U.S.C. § 2254(e)(1).

Simply because a defendant's spouse is estranged from him or her does not give rise to a presumption that the individual is under the prosecution's control. *See People v. Ryklin*, 150 A.D.2d 509, 512, 541 N.Y.S.2d 103 (2d Dept.), *appeal denied*, 74 N.Y.2d 746, 545 N.Y.S.2d 121, 543 N.E.2d 764 (1989) (defendant, who had engaged in armed stand-off with police after being presented with an order of protection by his wife, not entitled to a missing witness charge based on the prosecution's failure to call his wife; court noted that wife was not under the control of law enforcement officials). Defense counsel's argument that Lisa Mastin would be expected to testify favorably for the prosecution is undercut by the fact that she continued to live with her husband after the fire, Trial Tr. at 728, and to visit him in jail until shortly before the trial, Pet'r Habeas Br. at 84. In addition, and perhaps most detrimental to Mastin's claim, defense counsel acknowledged at trial and at the sentencing hearing that he could have called Lisa Mastin as his witness if had chosen to do so. *See* Trial Tr. at 1338 and 10/22/96 Sentencing Tr. at 18.

In any event, defense counsel took full advantage of the opportunity to comment during his summation upon the absence of Lisa Mastin at trial, *see* Trial Tr. at 1336–40, thereby ameliorating any error in the court's failure to issue the requested instruction. *See United States v. Torres*, 845 F.2d 1165, 1170–71 (2d Cir.1988) (under federal rules, court's failure to give a missing witness charge was not reversible error, "especially given that the judge permitted defense counsel to argue the inference themselves in summation"); *Rodriguez v. Walker*, 1999 WL 61834, at *5 (S.D.N.Y. Feb. 9, 1999) (same); *Malik v. Kelly*, 1999 WL 390604, at *7 (E.D.N.Y. Apr. 6, 1999) (rejecting habeas claim for state court's failure to give missing witness charge; "reversal is particularly inappropriate where, as here, defense counsel was allowed to urge an adverse inference in summation").

Mastin's claim that the trial court erroneously refused to gave a missing witness charge thus provides no basis for habeas relief.

*Claim Nine: Delay in Arraignment*

■ In support of his ninth ground for habeas relief, Mastin alleges that he "was deprived of this (sic) constitutional right to counsel, his right not to incriminate himself, and his right to due process because there was a delay of approximately eleven hours between the time he was taken into custody and the arraignment." Addendum 2 to Pet'n at 6.

For purposes of determining the length of the delay before his arrest and arraignment, Mastin starts the clock at approximately 10:45 a.m. on the morning of December 21, 1995, when he first was given *Miranda* warnings by Brand at the OCSO; according to Mastin, he "was in custody, not free to leave, and under *de facto* arrest at this time." Pet'r Habeas Br. at 86. Alternatively, Mastin asserts that the "time of custody can be no later than 1:25 p.m." when Prescott informed Mastin that he "failed the polygraph examination." *Id.* Finally, Mastin states that at 5:15 p.m., when he allegedly admitted that he started the fire, "there is no question but that he is in custody and under arrest." *Id.* at 86–87. In support of this contention, Mastin points to Brand's testimony that up until 5:15 p.m., Mastin was free to leave the OCSO. Trial Tr. at 806. Mastin complains that Brand did not actually tell him that he was under arrest until approximately 10:20 p.m., but he concedes that his arraignment took place "shortly thereafter."

In disposing of Mastin's claim relating to the alleged delay in his arraignment, the Appellate Division calculated the delay commencing with his first inculpatory statements to the police at 5:15 p.m. The court held:

> We reject the contention that the statements [to police] should have been suppressed on the ground that defendant was deprived of his right to counsel. The delay in arraignment, which took place five hours after defendant first admitted setting the fire, was not undue, unnecessary or unreasonable. Additionally, there is no proof that the delay was for the purpose of depriving defendant of his right to counsel.

261 A.D.2d 892, 893, 690 N.Y.S.2d 801 (citations omitted).

The Supreme Court has not established a "bright line" rule as to what constitutes an unreasonable delay in the arrest-to-arraignment process so as to give rise to a constitutional violation. In *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), the Supreme Court recognized that under the Fourth Amendment, a person arrested without a warrant is entitled to a fair and reliable determination of probable cause, and that this determination must be made "promptly." *Id.* at 125, 95 S.Ct. 854. The Supreme Court sought to clarify the meaning of "promptly" in *County of Riverside v. McLaughlin*, 500 U.S. 44, 56, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), which held that a "jurisdiction that provides judicial determination of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*." 500 U.S. at 56, 111 S.Ct. 1661. However, a delay of less than forty-eight hours can violate the Constitution if a petitioner meets his burden of demonstrating that the delay was unreasonable. *Id.* Thus, *County of Riverside* held only that under the Fourth Amendment an arrestee must receive a prompt probable cause determination.

Mastin's arraignment claim appears to be based mainly on an alleged intentional deprivation of his Sixth Amendment right to counsel and a violation of his Fifth Amendment right to due process. Mastin concedes that the arraignment occurred shortly after an accusatory instrument was filed against him at 10:20 p.m. According

to Mastin, the five-hour "delay [in filing the accusatory instrument] was calculated to deprive [him] of his right to counsel," and therefore his confession to the police was unconstitutionally obtained. Pet'r Habeas Br. at 89. The gravamen of Mastin's present claim appears to be that Brand should have formally arrested him at 5:15 p.m., as soon as Mastin began to make inculpatory statements. *See id.* ("At 5:15 p.m., at the latest, the police had, according to them, sufficient probable cause to arrest [Mastin] but elected not to do so."). To the extent that Mastin's claim rests on an allegation that he was deprived of his right to have the police file an accusatory instrument and to be arrested, it must be dismissed.

In *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), the Supreme Court squarely rejected the contention that there is a constitutional right to be arrested. There, the defendant made inculpatory statements to a person whom he claimed was a federal agent. At trial, those statements were introduced and the defendant was convicted. On appeal, the defendant asserted that the government had sufficient grounds for arresting him before he made the admissions; had he been placed under arrest, the government could not have questioned him without observing his right to counsel. *Id.* at 309–10, 87 S.Ct. 408. The defendant in *Hoffa* argued that the statements were inadmissable because they were acquired by "flouting" his Sixth Amendment right to counsel. *Id.* at 310, 87 S.Ct. 408.

In rejecting this claim, the Supreme Court held:

The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they

wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.

*Id.; accord May v. Scully,* 1988 WL 96853, at *4–5 (S.D.N.Y. Sept. 13, 1988) (rejecting petitioner's claim that there was a deliberate delay in the filing of an accusatory instrument in order to postpone the attachment of his right to counsel until after he confessed; the police's decision to complete the investigation against petitioner and to apprehend him, before bringing formal charges, was not a violation of his constitutional right.).

Even assuming that Mastin was in custody as of 5:15 p.m., the five-hour delay in arraigning him was not unreasonable and did not deprive him of his Fifth Amendment right to due process. In *Holmes v. Scully,* 706 F.Supp. 195 (E.D.N.Y.1989), the district court observed:

[T]o the extent that federal habeas courts have even considered the constitutionality of delaying arraignment of state defendants, they have only done so as part of a Fifth Amendment-based analysis of the voluntariness of confessions. Thus, delay in arraigning a state defendant is not, in itself, a constitutional violation, but is at most a factor to be weighed in determining whether or not, viewed in the totality of the circumstances, an incriminating statement was the product of police coercion.

*Id.* at 202 (citing, *inter alia, United States ex rel. Petersen v. La Vallee,* 279 F.2d 396, 399 (2d Cir.) ("[M]ere delay between arrest and arraignment is not a ground for overturning a state conviction based upon a confession."), *cert. denied,* 364 U.S. 922, 81 S.Ct. 289, 5 L.Ed.2d 262 (1960)) (citing

*McNabb v. United States*, 318 U.S. 332, 345–46, 63 S.Ct. 608, 87 L.Ed. 819 (1943)); *accord, e.g., Blount v. Keane*, 1992 WL 210982, at *3–4 (E.D.N.Y. Aug. 6, 1992), *aff'd*, 993 F.2d 1532 (2d Cir.1993), *cert. denied*, 510 U.S. 922, 114 S.Ct. 323, 126 L.Ed.2d 269 (1993) (pre-arraignment delay, in and of itself, "is not improper coercion"). Indeed, Mastin has cited no case where delay in arraignment by state officials alone has been held to constitute such coercion so as to warrant reversal of a conviction. As discussed at pages 91–101, *infra*, this Court examined the totality of the circumstances surrounding Mastin's interrogation, including the five-hour delay in his arraignment, and determines that his confession was not the product of coercion.

Finally, if Mastin's claim is interpreted as resting on an alleged violation of his Sixth Amendment right to counsel, it must be rejected. Habeas courts in this circuit have found intervening time periods of substantially greater length than the five-hour delay here to be insufficient, standing alone, to warrant an inference of intentional delay. *See Haywood v. Portuando*, 2003 WL 1563770, at * 17–18 (S.D.N.Y. 2003) (delay of thirty-two hours in bringing petitioner to court for arraignment justified based on the circumstances of the ongoing criminal investigation); *Irons v. Ricks*, 2003 WL 21203409, at *10 (S.D.N.Y. May 22, 2003) (petitioner did not meet burden of proving that twenty-seven hour delay in arraignment was unreasonable where no evidence that delay was intentional or for any reason other than immediate investigations in the suspected robberies); *Gonzalez v. Sullivan*, 1990 WL 126189, at *3 (E.D.N.Y. Aug. 30, 1990), *aff'd*, 934 F.2d 419 (2d Cir.1991) (forty-five hours between arrest and arraignment does not give rise to right to counsel where none existed and does not warrant habeas relief where no evidence was presented to show intentional delay for improper purpose; hours alone cannot give rise to inference of intentional delay); *Holmes v. Scully*, 706 F.Supp. 195, 203 (E.D.N.Y.1989) (twenty-seven hour delay between arrest and arraignment is not in itself a constitutional violation and cannot give rise to a right to counsel where no such right exists; district court rejected habeas petitioner's claim that delay in arraignment requires suppression of lineup evidence under Fourth, Fifth and Sixth Amendments); *see also Blount v. Keane*, 1992 WL 210982, at *3–4 (E.D.N.Y. Aug. 6, 1992) (rejecting habeas petitioner's claim that right to counsel violated because police "strategically delayed" arraignment to prevent right to counsel from attaching).

■ Brand testified that Mastin never requested a lawyer. Trial Tr. at 759. However, at some point after the completion of the first typewritten statement and before the addendum, Mastin asked Brand whether Brand thought he should have a lawyer.[14] *Id.* at 759–60. Brand replied

---

**14.** This statement is not a sufficiently clear request for counsel which would require the police to desist from interrogating Mastin. *See Davis v. United States*, 512 U.S. 452, 455, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (petitioner's statement, "Maybe I should talk to a lawyer," after initially waiving right to attorney, was not a request for counsel; court held that there was no ground for suppression of statements); *accord Diaz v. Senkowski*, 76 F.3d 61, 64–65 (2d Cir.1996) (after earlier waiving right to attorney, petitioner stated: "I think I want a lawyer"; this did not "effectively assert his right to counsel"). In *Davis*, the Supreme Court stated that "[i]nvocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for assistance of an attorney." *Davis*, 512 U.S. at 459, 114 S.Ct. 2350 (internal quotations omitted). Therefore, "if a suspect makes a reference to any attorney that is

that he could not answer that question and again advised Mastin of his *Miranda* rights. *Id.* at 760. Mastin agreed to continue speaking with Brand without an attorney present. *Id.*

As noted above, Mastin did not testify at the *Huntley* hearing. In support of his petition, Mastin has not adduced any evidence apart from his testimony at trial to substantiate his claim that the police wilfully delayed his arraignment in order to deprive him of his right to counsel. The factual findings of the trial court at the *Huntley* hearing and the Appellate Division on direct appeal are presumed correct, and Mastin has not rebutted them by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Accordingly, Mastin's claim based on the delay in his arrest and arraignment affords no basis for habeas relief.

### Claim Ten: Cross–Examination in Violation of Sandoval Ruling

■ As his final ground for habeas relief, Mastin asserts that the prosecutor failed to obey the trial court's *Sandoval* [15] ruling precluding cross-examination of him concerning several violent acts. The People argue that Mastin "opened the door" to such questioning by claiming on cross-examination that he was not a violent person.

On direct appeal, the Fourth Department agreed with the People, holding that:

> The prosecutor was not guilty of misconduct for questioning defendant in disregard of the *Sandoval* ruling. By asserting that he is a nonviolent person, defendant opened the door to cross-examination concerning prior violent acts.

261 A.D.2d 892, 894, 690 N.Y.S.2d 801 (citations omitted).

A claim based on an alleged *Sandoval* violation deals with an evidentiary question and presents an issue for habeas relief only if the petitioner establishes that the trial court committed error that constitutes a deprivation of a constitutionally recognized right. *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir.1998), *cert. denied*, 525 U.S. 840, 119 S.Ct. 101, 142 L.Ed.2d 81 (1998). Only the introduction of improper evidence that "is so extremely unfair that its admission violates fundamental conceptions of justice" denies a defendant's right to due process and may be reviewed by the habeas court. *Id.* (quoting *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (internal quotations omitted)). Evidence improperly admitted is "so extremely unfair" when it is " 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.' " *Dunnigan*, 137 F.3d at 125 (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir.1992)). The reviewing court must consider the evidentiary ruling in light of the whole record. *See id.*

Review of the entire trial transcript compels this Court to conclude that the trial court did not commit error in permitting the prosecutor to inquire into the alleged violent acts, much less error of constitutional magnitude. Mastin rendered himself susceptible to being questioned about those incidents when he testified that he was "not a violent person." Trial Tr. at 1125. The Appellate Division's

ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require cessation of questioning." *Id.* (emphasis in original). In any event, here Brand stopped the interrogation and reinformed Mastin of his *Miranda* rights, and Mastin chose to continue without an attorney present.

15. *People v. Sandoval*, 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413(1974).

decision that Mastin thus "opened the door" with his prior testimony is supported by both applicable New York and federal law. *See United States v. Payton,* 159 F.3d 49, 58–59 (2d Cir.1998); *People v. Fardan,* 82 N.Y.2d 638, 645–46, 607 N.Y.S.2d 220, 628 N.E.2d 41 (1993); *see also Shakur v. Portuondo,* 1999 WL 759993, at *3–4 (S.D.N.Y. Sept. 27, 1999) (rejecting habeas claim based on *Sandoval* violation where petitioner testified that he had legitimate employment at the time of the crime and that he had never sold drugs); *Senor v. Greiner,* 2002 WL 31102612, at *13 (E.D.N.Y. Sept.18, 2002) (finding habeas claim based on *Sandoval* violation meritless where defense counsel opened the door by eliciting the facts underlying petitioner's felony convictions). Moreover, defense counsel did not object to the prosecutor's line of questioning at trial and in fact used one of the incidents to his advantage on summation. *See* Trial Tr. at 1327. Because the prosecutor's alleged *Sandoval* violation did not constitute an error of constitutional dimension, it is not amenable to federal court habeas review.

### Merits of Exhausted Claims

### Claim One: "Newly Discovered Evidence"

Mastin asserts that the prosecution's "key witness," John Lewis, "gave perjured testimony at trial, and the prosecution was, or should have been, aware of this, thereby denying the petitioner his constitutional right to due process of law." Pet'r Habeas Br. at 13. Mastin also claims that the trial court erroneously denied his motion to vacate the conviction based on the newly discovered evidence of Lewis's perjury, which allegedly proves that the prosecutor perpetrated a fraud upon the court. *Id.* at 18.

At the outset, I note that Mastin does not claim that Lewis recanted his trial testimony to the prosecutor. Rather, proof of Lewis's allegedly false testimony is contained in the affidavits of two individuals who were not involved in Mastin's trial but supposedly knew Lewis personally. Defense counsel claims that several weeks after sentencing, he was alerted to Lewis's perjury by Robert Donk ("Donk"). Donk, a criminal defendant represented by one of counsel's colleagues, averred that Lewis admitted to giving false testimony at Mastin's trial. On the basis of Donk's affidavit to this effect, defense counsel filed a motion to vacate the judgment pursuant to C.P.L. § 440.10(1)(g), (b), and (c).[16]

Defense counsel subsequently received information from Steven Boni ("Boni") claiming that Lewis attempted to suborn Boni into making perjured statements to the Ontario County District Attorney for the benefit of Lewis. Counsel submitted an affidavit from Boni, also a criminal defense client of one of his colleagues, in further support of the motion to vacate the

**16.** C.P.L. § 440.10(1) provides in relevant part that "[a]t any time after the entry of a judgment, the court in which it was entered may, upon motion of the defendant, vacate such judgment upon the ground that: ... (b) [t]he judgment was procured by ... misrepresentation or fraud on the part of ... a prosecutor ...; (c) [m]aterial evidence adduced at a trial resulting in the judgment was false and was, prior to the entry of the judgment, known by the prosecutor or by the court to be false; or ... (b) [n]ew evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have bee more favorable to the defendant provided that a motion based upon such ground must be made with due diligence after the discovery of such alleged new evidence[.]"

judgment. In opposition to the motion, the district attorney submitted a sworn affirmation from Lewis, in which he verified that his trial testimony was truthful and unequivocally denied every statement made by Donk in his affidavit.

Justice Harvey denied Mastin's C.P.L. § 440.10 motion without a hearing in a summary written decision entered July 7, 1997. App. 2 at 9–10. Mastin appealed to the Fourth Department which considered the appeal of the C.P.L. § 440.10 motion simultaneously with the direct appeal of his conviction. The Appellate Division's decision did not address the C.P.L. § 440.10 issues specifically but held that:

> We have reviewed defendant's remaining contentions, including those raised on the appeal from the order denying the C.P.L. article 440 motion, and conclude that they are without merit.

*People v. Mastin,* 261 A.D.2d at 894–95, 690 N.Y.S.2d 801.

Both state court decisions are bereft of any factual findings regarding Mastin's newly discovered evidence claim, making the usual question of the degree of deference to accord such findings inapplicable here. *Ortega v. Duncan,* 333 F.3d 102, 106 (2d Cir.2003) (citing *Channer v. Brooks,* 320 F.3d 188, 195 (2d Cir.2003) (*per curiam*) ("[W]here a state court does not resolve a question of fact, no presumption of correctness can possibly attach with respect to that issue.")).

As a threshold matter, the Court must determine whether perjured testimony was introduced at Mastin's trial. Motions for a new trial based upon newly discover-

ed evidence are "granted only with great caution in the most extraordinary circumstances." *United States v. Di Paolo,* 835 F.2d 46, 49 (2d Cir.1987) (internal citations and quotations omitted). In particular, courts are reluctant to grant new trial motions where the newly discovered evidence consists of a witness recantation as such recantations are " 'looked upon with the utmost suspicion.' " *United States v. Gallego,* 191 F.3d 156, 166 (2d Cir.1999) (quoting *United States v. Di Paolo,* 835 F.2d at 49 (citations omitted)). Where, as here, the alleged recantation is repudiated by sworn testimony, a greater degree of skepticism is warranted. *See United States v. Di Paolo,* 659 F.Supp. 120, 122 (W.D.N.Y.) (denying motion for new trial where oral recantation was unsworn and was repudiated by affirmation under oath), *aff'd,* 835 F.2d 46 (2d Cir.1987); *Penick v. Filion,* 144 F.Supp.2d 145, 154 (E.D.N.Y. 2001) (finding unsworn oral recantation unreliable where witness claimed not to remember the recantation and reaffirmed his trial testimony under oath at the evidentiary hearing).

Lewis's "recantation" comes to the Court via Robert Donk, who claims that Lewis admitted to having lied at Mastin's trial. Lewis, however, never actually recanted his testimony to the District Attorney or the police. In fact, Lewis signed an affirmation in which he denied that he ever had a conversation with Donk about the Mastin trial and specifically controverted every allegation in Donk's affidavit. *See* March 13, 1997 Affidavit of John Lewis, ¶¶ 1–5, submitted in opposition to Mastin's C.P.L. § 440.10 Motion, App. 2 at 44.[17]

---

**17.** It is highly doubtful whether Boni's affidavit, summarizing the two letters sent to him by Lewis in May and June of 1996 in which Lewis allegedly attempted to convince Boni to perjure himself, constitute "newly discovered evidence" on which to base a claim of actual innocence. In the June 8, 1996 letter, Lewis

wrote, "[M]aybe we can put things together— what have we got to lose—And I'm looking at a year and a half unless we can make Tantillo interested. I'm going to push Greenwood as of next week so do your homework[.]" Even assuming that Lewis wanted Boni's help in concocting some sort of story, the ruse appar-

On the facts before me, I cannot find that a recantation in fact occurred in Mastin's case.

The Second Circuit has explained that a determination that a witness's recantation is not credible "is insufficient to establish that [the witness's] trial testimony was not perjured." *Ortega v. Duncan*, 333 F.3d 102, 109 (2d Cir.2003). Although a recantation must be " 'looked upon with the utmost suspicion,' " its "lack of veracity cannot, in and of itself, establish whether testimony given at trial was in fact truthful." *Id.* The reviewing court instead must "weigh all the evidence of perjury before it, including but not limited to the recantation, before reaching this conclusion." *Id.*

There are several significant corroborative details in Lewis's testimony that refute Mastin's claim of fabrication. First, Lewis testified that Mastin told him that not only did he use kerosene from the oil lamps, he poured the oil on the throw rug at the bottom of the stairs. This is a salient detail, and defense counsel does not argue that the July 1996 telephone conversation between Mastin and his father, which Lewis supposedly overheard, also included references to rugs. Moreover, he does not explain how Lewis could have learned that there was a throw rug at the base of the stairs. In addition, Lewis tes-

ently involved stolen computer equipment and had nothing to do with any of the events about which Lewis ultimately testified at Mastin's trial. *See* Affidavit of Steven Boni, App. 2 at 28–32; Handwritten letters signed by "Jack", App. 2 at 33–35. Indeed, Mastin concedes this point. Pet'r Habeas Br. at 15. Mastin argues, however, that these letters "are extremely relevant and telling of what Lewis's true motivation was when he testified against Mastin." *Id.* Thus, at most, Boni's affidavit is merely impeachment evidence which ordinarily does not justify a new trial. *United States v. Reyes*, 49 F.3d 63, 68 (2d Cir.1995) (citing *Mesarosh v. United States*, 352 U.S. 1, 9, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956)); *United States v. Payne*, 63 F.3d 1200, 1210 (2d

tified that Mastin said that he was upset with Lisa because of how late she had been out and that he last saw Lisa with Louis at the top of the stairs. Although he denied being angry with his wife at how late she had come home, Mastin admitted on the stand that he was somewhat disgusted with her behavior. Trial Tr. at 1073. Lewis's testimony is further corroborated by Officer Bennett, who testified that Mastin had reported last seeing Louis at the top of the stairs before he left the house. *Id.* at 511.

Even assuming that Lewis recanted his testimony and perjured himself at trial, which this Court explicitly does not find to be the case, Mastin would not necessarily be entitled to habeas relief. *Ortega v. Duncan*, 333 F.3d at 108 (although the district court committed clear error in determining that recanter had testified truthfully at trial, this was not sufficient, in and of itself, to grant habeas relief). A claim " 'based on newly discovered evidence ha[s] never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.' " *Id.* (quoting *Herrera v. Collins*, 506 U.S. 390, 400, 113 S.Ct. 853, 860, 122 L.Ed.2d 203 (1993)) (citing *Townsend*

Cir.1995) (Newly discovered evidence is not material where it merely constitutes "an additional basis on which to impeach a witness whose credibility has already been shown to be questionable."), *cert. denied*, 516 U.S. 1165, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996). The allegedly new evidence also was cumulative of other significant evidence that placed Lewis's credibility at issue. Defense counsel aggressively questioned Lewis about his extensive criminal history, which notably included several crimes of dishonesty. The jury was thus well aware that he was not a witness of impeccable character, and this new evidence certainly would not have transformed him from model citizen to miscreant.

*v. Sain,* 372 U.S. 293, 317, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), for the proposition that state proceedings "must bear upon the constitutionality of the applicant's detention"). In order for a habeas writ to issue, a due process violation therefore must have occurred at Mastin's trial.

■ The Second Circuit has held that a showing of perjury at trial does not in itself establish a violation of due process warranting habeas relief. *Sanders v. Sullivan,* 863 F.2d 218, 222 (2d Cir.1988) ("*Sanders I* "). Instead, when a prosecution witness presents false testimony without the district attorney's knowledge,[18] due process is violated only " 'if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.' " *Ortega,* 333 F.3d at 108 (quoting *United States v. Wallach,* 935 F.2d 445, 456 (2d Cir.1991) (in turn

quoting *Sanders I,* 863 F.2d at 226) (alteration in *Wallach* )); *see also United States v. Gallego,* 191 F.3d at 162.[19]

■ In this case, I do not find that the testimony offered by Lewis was material to Mastin's conviction. It is true that Lewis's testimony that Mastin admitted starting the fire using kerosene from the oil lamps corroborates the prosecution's expert witness who testified that the fire was the work of an arsonist using some type of accelerant. However, even if Lewis's trial testimony is stricken from the equation, or if it is assumed that Lewis would have testified truthfully in accordance with his recantation, the jury still could have convicted Mastin on the strength of the other compelling evidence against him. The jury also had before it Mastin's signed statements confessing to starting the fire, along with substantial circumstantial evidence unequivocally

18. The only evidence adduced by Mastin in support of this claim consists of statements by Lewis's ex-girlfriend to the assistant district attorney. According to Mastin, the ex-girlfriend stated that Lewis is "a little crazy" and "manipulative," and she asked "how could you put him on the stand?" Pet'r Habeas Br. at 16. The ex-girlfriend did not state that Lewis was going to perjure himself, and Mastin offers no other evidence that the prosecution actually knew that Lewis was going to offer false testimony. Rather, Mastin argues that on the basis of the ex-girlfriend's statements about Lewis's character, the prosecution should be charged with knowing that Lewis would not testify truthfully at trial. Thus, Mastin frames his perjury claim in terms of the prosecution's constructive knowledge—that the district attorney should have known that Lewis was going to present false testimony at trial. *See United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (citing *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)). Because I find that Mastin has not made a sufficient showing that Lewis actually recanted his testimony or committed perjury at trial, I need not decide Mastin's *Brady* claim. As yet, the Second Circuit has "de-

cline[d] to draw the contours of the phrase 'should have known.' " *Drake v. Portuondo,* 321 F.3d 338, 345(2d Cir.2003). This Court doubts that the ex-girlfriend's general criticism of Lewis, which incidentally does not purport to reflect on his veracity, would be adequate to serve as constructive notice of prospective perjury.

19. In *Ortega,* the Second Circuit observed that *Wallach* and *Gallego* were direct appeal cases rather than collateral attacks. They therefore required considering "the impact of witness perjury in the first instance" rather than examining a state court determination of the issue under § 2254's deferential standard. 333 F.3d at 108 n. 4 (citing *Channer,* 320 F.3d at 196). The Second Circuit determined in *Ortega* that, since the state court never adjudicated the perjury issue and the district court reached the erroneous conclusion that the witness did not perjure himself, it was in the position to consider the impact of the rebater's perjury for the first time. *Id.* Similarly, here, the state courts did not make any factual findings regarding Lewis' alleged perjury and therefore the Court's review is not circumscribed by § 2254's deferential standard.

pointing to Mastin's guilt. Moreover, Mastin's version of events on that morning conflicted with the sworn testimony of every other witness at trial. *Cf. Penick,* 144 F.Supp.2d at 154 (finding recantation material where, if recanting witness's trial testimony were not considered, or if he testified truthfully in accordance with his recantation, the jury could not have convicted petitioner of the charged armed robbery).

Even if there were newly discovered competent evidence that Lewis recanted, it would not leave this Court with the "firm belief" that but for Lewis's trial testimony, it was unlikely that the jury would have convicted Mastin. *See Ortega,* 333 F.3d at 109 (citing *Wallach,* 935 F.2d at 459). In light of the extremely compelling evidence against Mastin, I am not persuaded that the jury would have been sufficiently affected by newly discovered evidence that Lewis perjured himself so as to have a reasonable doubt that Mastin intentionally set the fire. *See id.*

Finally, Lewis has always maintained that Mastin confessed to him in jail and that he never told Donk otherwise. Even assuming that the new evidence was presented at the criminal trial, the jury still would have been confronted with the issue of Lewis's veracity. In that respect, the purported recantation does not amount to more than " 'the sort of cumulative impeachment material that is routinely held insufficient to warrant a new trial,' " or in this case, habeas relief. *Chamberlain v. Mantello,* 954 F.Supp. 499, 511 (N.D.N.Y. 1997) (quoting *United States v. White,* 972 F.2d 16, 20 (2d Cir.), *cert. denied,* 506 U.S. 1026, 113 S.Ct. 669, 121 L.Ed.2d 593 (1992)).

### Claim Two: Preclusion of the Telephone Conversation Concerning Oil Lamps

Mastin claims that the trial court improperly refused to allow defense counsel to question Mastin and his father about a conversation in which they discussed the presence of kerosene oil lamps in the Mastin household. This conversation allegedly occurred while Mastin was speaking on a pay telephone in close proximity to the jail cell he shared with Lewis. At trial, Lewis testified that Mastin confessed to him that he doused a throw rug at the base of the stairs with kerosene oil from the lamps to start the fire. Mastin denied that he ever made this confession and sought to use the testimony to prove that Lewis actually came to know there were oil lamps at the house by eavesdropping on Mastin's conversation with his father.

At trial, defense counsel raised the issue during the direct examination of his father, Ed Mastin ("Mastin, Sr."):

Q: Moving on to the—to the month of July this year, did you ever call your son?

A: He called me one night.

The Prosecutor: Objection; not responsive.

The Court: Sustained. That will be stricken.

Q: Fine. Did anybody call anybody between the two of you?

A: Yes.

Q: Who called who?

A. Mark called me one night.

Q: All right. Did the subject of oil lamps come up in that conversation?

A: Yes, sir.

The Prosecutor: Objection; that's the back hand way of getting hearsay in.

The Court: Sustained.

. . . . . .

Q: Do you recall one of these calls being in mid-July, right?

A: Yes, sir.

The Prosecutor: Objection; leading.

The Court:Sustained. It will be stricken. You may rephrase, counsel. Sustained as to form.

Trial Tr. at 1030–32. After the trial court sustained the prosecutor's second objection, defense counsel abandoned this line of inquiry.

On direct appeal, the Appellate Division found that it was error for the trial court to have excluded evidence of statements made by Mastin to his father, holding that "[t]hose statements were not offered for their truth, but for the fact that they were made." 261 A.D.2d at 894, 690 N.Y.S.2d 801 (citing, *e.g.*, Prince, Richardson on Evidence § 8–104 (Farrell 11th ed.)). However, the court found that the error was "harmless" in light of the "overwhelming" evidence of defendant's guilt. *Id.* (citations omitted).

■ As a general rule, state evidentiary rulings do not implicate federal law and are therefore not appropriate for review by federal courts. *See Dunnigan v. Keane*, 137 F.3d at 125. Instead, such rulings are generally left to the discretion of the trial court. *Estelle v. McGuire*, 502 U.S. 62, 71–72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). "[E]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus. Rather, the writ [should] issue *only* where [the] petitioner can show that the error deprived [him] of a *fundamentally fair* trial." *Rosario v. Kuhlman*, 839 F.2d at 924–25 (emphasis in original) (quotation marks and citation omitted).

"[W]hether the exclusion of … testimony violate[s] [Mastin's] right to present a defense depends upon whether 'the omit-ted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *Justice v. Hoke*, 90 F.3d 43, 47 (2d Cir.1996) (quoting *United States v. Agurs*, 427 U.S. at 112, 96 S.Ct. 2392); *accord, e.g., Jones v. Stinson*, 229 F.3d at 120. On habeas review, trial errors are subject to "lenient harmless error review," and "the creation of otherwise non-existent reasonable doubt satisfies the 'substantial and injurious' standard [of *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) ]." *Washington v. Schriver*, 255 F.3d 45, 56–57 (2d Cir.2001) (quoting *Jones*, 229 F.3d at 120 (alterations in the original) (citations omitted)). The omission of the testimony at issue "'must be evaluated in the context of the entire record.'" *Rosario*, 839 F.2d at 926 (quoting *Agurs*, 427 U.S. at 112, 96 S.Ct. 2392).

■ In the present case, this Court agrees with the Appellate Division that the trial judge erred in precluding introduction of the conversation in which the topic of oil lamps was mentioned. The defense did not seek to offer the testimony "to prove the truth of the matter asserted," [20] *i.e.*, that there were kerosene oil lamps in the Mastin household. Rather, defense counsel sought to offer the statements for the fact they had been made, and that they conceivably provided another avenue by which Lewis could have learned of the presence of oil lamps. As such, the statements were non-hearsay and should have been admitted. *See, e.g. United States v. Harwood*, 998 F.2d 91, 99 (2d Cir.) (out-of-court statements may be offered, not to prove their truth, but solely for the limited proving that they were made, if the fact that they were made is relevant to the case), *cert. denied*, 510 U.S. 971, 114 S.Ct.

---

**20.** Hearsay is defined under the Federal Rules of Evidence ("F.R.E.") as "a statement, other than one made by the declarant while testify-ing at the trial or hearing, offered in evidence to prove the truth of the matter asserted." F.R.E. 801(c).

456, 126 L.Ed.2d 388 (1993); *Anderson v. United States*, 417 U.S. 211, 220–21, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974) (out-of-court statements consisting of election contest testimony, where admitted into evidence not to prove truth of anything asserted therein but simply to prove that the statements were made so as to establish foundation for later showing, through other admissible evidence, that they were false, were not hearsay).

■ However, even assuming that the testimony should have been admitted and that its exclusion was clear error, viewing the record as a whole, this Court cannot conclude "that it would so certainly have created new ground for reasonable doubt that the Appellate Division's decision was objectively unreasonable." *Jones v. Stinson*, 229 F.3d at 120. Defense counsel argues that the error caused by excluding the statements could not be harmless because Lewis was the "lynchpin" of the prosecution's case. According to Mastin, the error was compounded by the fact that during the prosecutor's summation, he informed the jury that "there is no way on earth for John Lewis to know about … the lamps in the house unless this defendant told him." Trial Tr. at 1419. However, Lewis also testified as to other details that only could have been gleaned from Mastin or his wife. *See* pages 79–80, *supra.*

Even if the court had permitted the introduction of the statements by Mastin to his father, the jury still could have believed Lewis's testimony that Mastin confessed to him in jail and could have discredited the oil lamp conversation as wholly self-serving, especially since it was made after Mastin had a motive to falsify. The omitted statements would not have proven conclusively that Mastin did *not* admit to Lewis that he started the fire. The introduction of the conversation mere-ly would have created another possible means by which Lewis could have learned of the presence of oil lamps at the house.

Moreover, Lewis provided neither the sole, nor the most important evidence against Mastin. Although statements concerning the oil lamps arguably might have colored the record, the Court cannot say that they would have created a reasonable doubt where one did not otherwise exist, particularly in view of the other compelling evidence of Mastin's guilt. Thus, in concluding that any error in precluding Edward Mastin's testimony concerning oil lamps was harmless, 261 A.D.2d at 894, 690 N.Y.S.2d 801, the Appellate Division did not unreasonably apply clearly established Federal precedent.

### Claim Three: Improper Curtailment of Cross-Examination

■ Mastin further claims that he is entitled to have his conviction overturned because the trial court erroneously limited his defense counsel's cross-examination of prosecution witness Lewis. At trial, the court refused to allow counsel to question Lewis regarding the facts underlying a pending criminal charge of offering a false instrument for filing.

On direct appeal, the Appellate Division held that:

> The court erred in precluding cross-examination of a prosecution witness concerning a pending criminal charge. Nonetheless, the error is harmless. The witness was cross-examined extensively concerning his criminal record, and proof of one additional charge would have been cumulative and would not have incrementally affected the jury's evaluation of credibility. Moreover, the evidence of defendant's guilt, including defendant's statements and the circumstances surrounding the fire, is overwhelming, and there is no significant

probability that defendant would have been acquitted but for the error.

*People v. Mastin*, 261 A.D.2d at 894, 690 N.Y.S.2d 801 (citations omitted).

 "Cross-examination is not improperly curtailed if the jury is in possession of facts sufficient to make a 'discriminating appraisal' of the particular witness's credibility." *United States v. Rosa*, 11 F.3d 315, 336 (2d Cir.1993), *cert. denied*, 511 U.S. 1042, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994) (citing *United States v. Roldan–Zapata*, 916 F.2d 795, 806 (2d Cir.1990), *cert. denied*, 499 U.S. 940, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991)). Moreover, the court retains "'wide latitude ... to impose reasonable limits on such crossexamination based on concerns about, among other things, ... interrogation that is repetitive or only marginally relevant.'" *Jones v. Berry*, 880 F.2d 670, 673 (2d Cir.1989) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). Finally, "the scope and extent of cross-examination are generally within the sound discretion of the trial court, and the decision to restrict cross-examination will not be reversed absent an abuse of discretion." *United States v. Rosa*, 11 F.3d at 335–36.

On cross-examination, defense counsel questioned Lewis at length about his arrests for assault and larceny, as well as his convictions of grand larceny, forgery, aggravated harassment, and three charges of criminal contempt. *See* Trial Tr. at 902–911. Even without evidence of the additional charge, defense counsel showed that Lewis's credibility was suspect and attempted to expose his personal interest and mendacity. The jury possessed sufficient facts sufficient to make a "discriminating appraisal," *see United States v. Rosa*, 11 F.3d 315, 336, of Lewis's character. The Appellate Division's conclusion that any error in precluding defense coun-

sel from examining Lewis about one pending criminal charge was harmless, 261 A.D.2d at 894, 690 N.Y.S.2d 801, is not an unreasonable application of clearly established Federal precedent. Mastin is not entitled to habeas relief on this ground.

**Claim Four: Voluntariness of Confession**

 Mastin contends that his conviction cannot stand because his December 21, 1995 confessions "were involuntarily made and were obtained in violation of his constitutional rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution." Pet'r Habeas Br. at 35. He claims that Brand and Prescott threatened and coerced him into making the inculpatory statements by telling him that the polygraph showed that he was lying and by promising that he would not be charged if he confessed.

The "ultimate issue of voluntariness [of a confession] is a legal question requiring independent federal determination." *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)); *see also Nova v. Bartlett*, 211 F.3d 705, 707 (2d Cir.2000); *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (holding that the Court is not bound by a state court's determination that a statement was voluntary; "[i]nstead, the Court is under a duty to make an independent evaluation of the record"). "'No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances.'" *Nelson*, 121 F.3d at 833 (quoting *Green v. Scully*, 850 F.2d 894, 901 (2d Cir.), *cert. denied*, 488 U.S. 945, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988)). Factors to be considered include the accused's experience and education;

the conditions of the interrogation; and the conduct of law enforcement officials, notably, whether there was physical abuse, the period of restraint in handcuffs, and use of psychologically coercive tactics. *Id.* (citing *Green,* 850 F.2d at 901). " '[S]ub-sidiary questions, such as the length and circumstances of [an] interrogation,' " or whether " 'the police engaged in the intimi-dation tactics alleged by the defendant,' are entitled to the presumption of correct-ness." *Id.* (quoting *Miller v. Fenton,* 474 U.S. 104, 112, 117, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985)); *see also Towndrow v. Kelly,* 2000 WL 33743385, at *4 (N.D.N.Y. Dec. 20, 2000) (factual findings relevant to the voluntariness of a habeas petitioner's confession made by the state court are entitled to the presumption of correctness, and a petitioner must rebut this presump-tion by clear and convincing evidence) (cit-ing 28 U.S.C. § 2254(e)(1)).

At the *Huntley* hearing, Prescott and Brand testified, but Mastin chose not to. Justice Harvey made the following factual findings concerning Mastin: that he was provided with lunch, beverages, cigarettes, and restroom breaks; that he voluntarily participated in the polygraph; that he was given *Miranda* warnings at the commence-ment of the interrogation, prior to his pro-viding a written statement, and when he mentioned an attorney; and that he know-ingly and intelligently waived his *Miranda* rights. Justice Harvey concluded that "[t]here were no threats or words put in the defendant's mouth and the procedure was in no way coercive." 7/10/96 Order, App. 1 at 159–162.

Later, Mastin testified at trial that Brand and Prescott threatened him, made false representations to him regarding the polygraph, and promised him leniency if he confessed. As at the *Huntley* hearing, defense counsel vigorously cross-examined Brand and Prescott as to the circum-

stances surrounding Mastin's confession. Rejecting Mastin's version of events, the jury found him guilty.

On direct appeal, the Appellate Division weighed Mastin's trial testimony against the testimony of the individuals who con-ducted the interrogation, and held that:

The court properly denied the motion to suppress defendant's statements. The record of the *Huntley* hearing es-tablishes that the statements were not elicited by coercion or other improper tactics that resulted in defendant's will being overborne or defendant's capacity for self-determination being critically impaired. The length of the interroga-tion was not such as to deprive defen-dant of due process. Nor did police treatment of defendant render the statements involuntary. The prosecu-tion witnesses, whose testimony the suppression court and jury were enti-tled to credit, testified that defendant was cooperative throughout the interro-gation, never asked that questioning cease, and never asked for counsel. Police furnished defendant with lunch, beverages, cigarettes and restroom breaks.

We reject the contention that depen-dant's statements were rendered invol-untary by the fact that interrogators told defendant that he had failed a poly-graph. There was no showing that po-lice lied about the polygraph or its re-sults. In any event, such stratagems, even when they involve some guile on the part of police, do not ordinarily de-prive a defendant of due process. Fur-ther, police did not make any promises or threats that would have induced a false confession.

*People v. Mastin,* 261 A.D.2d at 892–93, 690 N.Y.S.2d 801 (citations omitted).

Beyond Mastin's allegation at trial that Brand threatened to throw him up against

the wall if he failed to look at Brand, Trial Tr. at 1122, the record gives no other indication that the interrogation involved any form of physical coercion; Mastin conceded that he was not physically harmed in any way. *Id.* at 1262. Rather, Mastin focuses on the psychologically coercive tactics allegedly utilized by the police. In particular, he complains about statements by Brand and Prescott that no one would ever hear what he said if he confessed (*id.* at 1131–32); that he would not be prosecuted if he confessed (*id.* at 1147–48); that if he wanted a lawyer he would have to be charged first (*id.* at 1153–54); and that the polygraph was 95 percent accurate and showed that he was lying (*id.* at 1118). To support these claims, Mastin relies exclusively upon the strength of his own testimony at trial.

Mastin's allegation that his "emotional and physical state had also been weakened and impaired by the 12–hour Brand–Prescott marathon-relay of questioning," Pet'r Habeas Br. at 37, simply strains credulity.[21] Including the time for administering the polygraph test, and excluding the half-hour lunch break, Mastin was interrogated for a total of at most eight and a half hours. Notably, Mastin first admitted that he set the fire at about 5:15 p.m., approximately midway through the interrogation process.

Moreover, there was no testimony that he had been deprived of sleep the night before or was suffering from the after-effects of drugs or alcohol use, factors which could have made him more susceptible to psychological pressure. Mastin conceded that he was given food, cigarettes, and restroom breaks throughout the day. Brand, Prescott, and Payne–Hall all testified that he was calm and quiet through the day, and never asked that the questioning cease. Mastin's mere statement that he was "tired of [the questioning]" and "scared" does not suffice to rebut the prosecution witnesses's testimony on this issue.

Even if the Court were to believe that the police lied about the accuracy of the polygraph and its results, "a falsehood by a police officer, although deplorable, does not necessarily induce an involuntary confession." *McNeal v. Rdo*, 1988 WL 108440, at *4 (S.D.N.Y. Oct. 6, 1988) (holding that petitioner was not improperly induced to confess by police officer's attempt to convince him that the polygraph machine was infallible), *cert. denied*, 493 U.S. 1030, 110 S.Ct. 744, 107 L.Ed.2d 762 (1990) (citing *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (police misrepresentations as to co-suspect's admissions not sufficient under totality of circumstances to conclude confession was involuntary); *Miller v. Fenton*, 796 F.2d

---

**21.** The testimony at trial was that Mastin took the polygraph examination from approximately 11:00 a.m. until 1 p.m., at which time he was given a half-hour lunch break. Prescott confronted him with the results of the test at 1:30 p.m., and questioned him until about 3:30 p.m. At that point, Brand took over the questioning and continued until 4:45 p.m. Prescott then returned and spoke with Mastin until about 6:00 p.m. At about 5:15 p.m., Mastin first indicated that he had started the fire.

Brand questioned Mastin again starting at 6:00 p.m. for about half an hour and took handwritten notes based on that conversation. These notes were transcribed into a written statement beginning at 6:29 p.m. which Mastin signed at approximately 7:00 p.m. Prescott rejoined Mastin at that time and questioned him until about 7:20 p.m. Brand came in at that time and questioned Mastin again for about an hour, although he is not certain of the time. At some point, Mastin gave another statement which the secretary typed on the computer; Mastin signed it at 9:16 p.m. There was no testimony that Mastin was interrogated any further after 9:16 p.m.

598 (3d Cir.) (lie about time of victim's death not "sufficient trickery" to overcome defendant's will), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986)). Here, even crediting Mastin's testimony that he was told that the polygraph machine was "95 percent accurate," Prescott still does not go as far as did the police officer in *McNeal* who asserted that the polygraph machine was "infallible." Moreover, Mastin failed to establish at the *Huntley* hearing or at trial that Prescott lied about the results of the polygraph test.

As further evidence that his confessions were the product of improper police conduct, Mastin asserts that the inculpatory statements he signed were solely the product of Brand's imagination. Mastin testified that he sat silently while Brand concocted the story about flicking a lit cigarette at the stairs, wrote it down, and then told Mastin to sign his name to it. Mastin's testimony that Brand, after suggesting various possible scenarios as to how the fire started, finally chose the one he found most convincing and put that in the confession, is particularly unpersuasive. If the statements truly were created out of whole cloth by Brand, there would have been no need to question Mastin again, as Brand did, to clarify certain details about the first one.[22]

▮ Mastin also complains that Prescott and Brand improperly used the "good-guy/bad-guy" method of questioning him, with Prescott playing the nice guy, and Brand acting as the heavy. However, indications of sympathy or assistance do not constitute psychological coercion. *McNeal,* 1988 WL 108440, at *5 (rejecting petitioner's claim that police created a false sense of sympathy and assistance, thereby inducing him to confess); *Miller v. Fenton,* 796 F.2d 598, 607 (3d Cir.) ("good guy" approach is permissible interrogation tactic), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986). Moreover, the Supreme Court has indicated that an interrogator's friendly or sympathetic demeanor is not in itself enough to render a confession involuntary. *See, e.g., Beckwith v. United States,* 425 U.S. 341, 343, 348, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (interrogator adopted sympathetic attitude, but resulting confession was voluntary); *Frazier v. Cupp,* 394 U.S. 731, 737–39, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (same). Even if Prescott's reassuring demeanor may have lent credibility to the promises Mastin claims were made to him, Mastin had been given his *Miranda* warnings before the interrogation even began. Thus, Mastin had been admonished that anything he said could be used against him and knew that he could be charged with a crime if he confessed to starting the fire. *See Miller,*

---

22. Mastin argues the confessions "were factually incorrect" and therefore prove that he was coerced. Pet'r Habeas Br. at 42. It is true that the description of how the fire was started, as set forth in Mastin's confessions, was not borne out by the prosecution's expert witness, who testified that the fire did not originate under the stairs and could not have been started by a lit cigarette. However, the confessions are not wholly inconsistent with the expert's opinion, since all of the statements place the fire's point of origin at the staircase. As the prosecutor persuasively argued, rather than proving that Mastin never confessed to starting the fire, the imperfect confessions suggest that Mastin was willing to admit his culpability up to a certain point but no further. Trial Tr. at 1413. The fact remains that there are signed statements by Mastin admitting that he intentionally set the fire. Absent other indicia of coercion sufficient to overbear Mastin's will, the factual differences between those statements and the manner in which the fire was determined to have started do not suffice to render the statements suspect, much less improperly obtained.

796 F.2d at 609 (*citing Frazier v. Cupp*, 394 U.S. at 739, 89 S.Ct. 1420).

■ Moreover, "the presence of a direct or implied promise of help or leniency alone has not barred the admission of a confession where the totality of the circumstances indicates it was the product of a free and independent decision." *Green v. Scully*, 850 F.2d 894, 901 (2d Cir.1988) (citing, *e.g.*, *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir.1987)); *accord United States v. Orlandez–Gamboa*, 320 F.3d 328, 333 (2d Cir.2003) (sole form of coercion defendant claimed was the inducement to plead guilty created by the prospect of a reduced sentence in exchange for disclosure of his criminal activities; that alone was not enough to make statements involuntary).

Mastin's claims of coercion and false promises rest solely upon his own testimony at trial, which was not corroborated by any of the other witnesses to his interrogation. The Court observes that the determination of voluntariness in these types of matters would be more easily made, and the number of such disputes likely reduced, if there existed a recording or transcript memorializing the questioning process. However, that is not the case here, and "as is almost invariably so in cases involving confessions obtained through unobserved police interrogation, there is a conflict in the testimony to the events surrounding the interrogations." *Davis v. North Carolina*, 384 U.S. 737, 741, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966). Essentially, Mastin argues that his own version of events is more credible than that of the prosecution witnesses. As in *Davis*, there were two sides to the story, and the state court came down on the other side.

Mastin admitted at trial that he was advised of his *Miranda* rights several times during the course of the interrogation, *id.* at 1259; 1289; that he was provided with lunch, beverages, and as many cigarettes as he wished throughout the day, *id.* at 1299; that he was given restroom breaks, *id.*; and that he was not physically harmed, *id.* at 1262. He admitted that he never refused to continue speaking with Brand and Prescott that day. *Id.* at 1288.

Moreover, Mastin was a mature adult of normal intelligence who had attained a high school education. "Such a person is more resistant to interrogation than a person who is very young, uneducated or weak-minded." *Miller v. Fenton*, 796 F.2d at 606 (petitioner, a thirty-two year-old man with a ninth grade education, not overly susceptible to psychological coercion). In light of these factors, Mastin's lack of experience with the criminal justice system is not sufficient to create an inference that his confession was coercively obtained.

Mastin has provided no new evidence, apart from his own testimony at trial, to refute the trial court's and state appellate court's factual findings concerning the circumstances of his interrogation, which are presumed to be correct. *See* 28 U.S.C. § 2254(e)(1). Mastin's trial testimony does not clearly and convincingly rebut this presumption of correctness. Upon the record before it, this Court is unable to find any special factors in this case which likely would have induced an involuntary confession. Thus, after considering the totality of the circumstances present here, I conclude that Mastin's statements were not improperly obtained.

***Claim Seven: Adverse Inference Charge Regarding Failure to Record Interrogation***

■ Mastin asserts that the OCSO's failure to electronically record the interrogation process on December 21, 1995, entitled the defense "to a charge to the trial

jury that an inference should be drawn against the prosecution that a tape would have documented evidence favorable to the petitioner's version of the interrogation process, to wit, that the confession was obtained by improper means." Addendum 2 to Pet'n at 4–5. Thus, the trial court's failure to give such a charge was error sufficient to require reversal of the conviction. *Id.*

At the outset, I note that the Supreme Court has instructed that "habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. at 67, 112 S.Ct. 475 (citations omitted); *accord Jones v. Stinson*, 229 F.3d at 120. Mastin has cited no Supreme Court or other federal precedent for the proposition that the failure to videotape his interrogation violated any right guaranteed under the United States Constitution.[23] To the contrary, several circuit courts have concluded that the federal Constitution does not obligate police officers to record interrogations or confessions. *See, e.g., Ridgley v. Pugh*, 176 F.3d 484 (9th Cir.1999) (habeas claim based on police officer's failure to tape record a portion of petitioner's interrogation "does not state a violation of a federal constitutional or statutory right"); *United States v. Zamudio*, 211 F.3d 1279 (10th Cir.2000) (denying certificate of appealability for petitioner's claim that Fifth Amendment due process rights were violated by the failure of the police to tape record his interrogation) (citing *United States v. Yunis*, 859 F.2d 953, 961 (D.C.Cir.1988) ("[T]there is no constitutional requirement that confessions be recorded by any partic-

ular means.")); *United States v. Toscano–Padilla*, 996 F.2d 1229, 1993 WL 210793 (9th Cir.1993) (declining to hold that a failure by law enforcement officials to record an interrogation violates due process and automatically mandates suppression). Thus, Mastin's argument that he was entitled have an adverse inference drawn against the prosecution based on the police's failure to videotape the interrogation does not present a claim of constitutional dimension and therefore is not cognizable on habeas review.

In any event, defense counsel emphasized the adverse inference during his summation, *see* Trial Tr. at 1356–63, asking the jury repeatedly whether it had heard "one good reason" from the prosecution why the police failed to record Mastin's interrogation. *Cf. Rodriguez v. Walker*, 1999 WL 61834, at \*5 (S.D.N.Y. Feb. 9, 1999) ("a trial judge's failure to give a missing witness instruction is generally not reversible error where defense counsel is permitted to argue the missing witness inference in their summation").

The Appellate Division's conclusion that this claim was "without merit," 261 A.D.2d at 894, 690 N.Y.S.2d 801, is neither "contrary to" nor an "unreasonable application of" clearly established Federal precedent. Mastin's claim that the trial court erroneously refused to give an adverse inference charge based on the failure to record his interrogation accordingly is dismissed.

### CONCLUSION

For the foregoing reasons, Mark Mastin's petition for a writ of habeas corpus is

---

**23.** One of the cases cited by Mastin in support of this argument found such a violation based solely on the due process clause of the state constitution. *See Stephan v. State*, 711 P.2d 1156, 1158 (Alaska 1985). In the other case, *State v. Scales*, 518 N.W.2d 587, 589 (Minn. 1994), the Minnesota Supreme Court declined to determine whether under the due process clause of the Minnesota Constitution a criminal suspect has a right to have his or her custodial interrogation recorded. Rather, the Court "in the exercise of [its] supervisory power to insure the fair administration of justice" held that custodial interrogation must be recorded when it occurs at a place of detention. 518 N.W.2d at 592.

denied. In addition, for the reasons set forth above and because the issues raised in the petition are not, in my view, the type that a court could resolve in a different manner, and because I do not believe that the issues are debatable among jurists of reason, I conclude that this petition presents no federal question of substance worthy of attention from the Court of Appeals. Therefore, pursuant to 28 U.S.C. § 2253 and Fed. R.App. P. 22(b), I hereby **deny** a certificate of appealability.

## ORDER

For the foregoing reasons, it is hereby **ORDERED** that petitioner's Petition for habeas corpus under 28 U.S.C. § 2254 is DENIED, and the proceeding is DISMISSED.

FURTHER, the Clerk of the Court is directed to enter judgment in favor of respondent and against petitioner.

**IT IS SO ORDERED.**